No. 83-164

IN THE SUPREME COURT OF THE STATE OF MONTANA

1984

MONTANA COALITION FOR STREAM ACCESS, INC.,
                    Plaintiff and Respondent,

        and

MONTANA DEPARTMENT OF FISH, WILDLIFE AND PARKS,
and THE STATE OF MONTANA,
                    Involuntary Plaintiffs and
                    Respondents,

        and

THE MONTANA DEPARTMENT OF STATE LANDS,
                    Plaintiff and Respondent,

        -vs-

DENNIS MICHAEL CURRAN,

                    Defendant and Appellant.

APPEAL FROM:    District Court of the First Judicial District,
                In and for the County of Lewis & Clark,
                The Honorable Gordon Bennett, Judge Presiding.

COUNSEL OF RECORD:

        For Appellant:

                Jardine, Stephenson, Blewett & Weaver; Alexander
                Blewett, III, argued, Great Falls, Montana

        For Respondents:

                Goetz, Madden & Dunn; James H. Goetz argued for Mont.
                Coalition for Stream Access, Bozeman, Montana
                Stan Bradshaw argued, Dept. of Fish, Wildlife & Parks,
                Helena, Montana
                John F. North argued, Dept. of State Lands, Helena

        For Amicus Curiae:

                Albert Stone, U of M Law School, Missoula, Montana
                Vincent J. Kozakiewicz, National Wildlife Fed. and
                Mont. Wildlife Federation, Missoula, Montana
                Daniel C. Murphy, Mont. Stock & Wool Growers, Helena
                Michael Coil, Mont. Trout Unlimited, Bozeman, Montana

                            Submitted:  January 23, 1984
                            Decided:    May 15, 1984

Filed:    MAY 15 1984

            _Ethel M. Harrison_
        _____
                    Clerk

Mr. Chief Justice Frank I. Haswell delivered the Opinion of the Court.

Appellant D. Michael Curran ("Curran"), appeals a Rule 54(b)-certified partial summary judgment entered in favor of plaintiffs, Montana Coalition for Stream Access, Inc. ("Coalition"), the State of Montana, the Montana Department of State Lands and the Montana Department of Fish, Wildlife and Parks. The District Court held that the public have a right to use waters and the streambed of the Dearborn River up to the high water mark as it flows through Curran's property and that the State of Montana owns the streambed between the low water marks. The District Court also dismissed Curran's counterclaim for inverse condemnation. We affirm.

The Dearborn River is approximately sixty-six miles long and originates along the east slope of the Continental Divide in west-central Montana. The river flows generally in a southeasterly direction from its source near Scapegoat Mountain, approximately thirty miles southwest of Augusta, Montana, to the Missouri River.

The first twenty miles of the Dearborn is through mountains and canyon terrain, roughly twelve miles of which is within the Scapegoat Wilderness. After it leaves the Wilderness area, the river emerges onto rolling plains and continues its flow for about twenty-nine miles, where it again enters a moderately timbered region. It then extends another seventeen miles and enters the Missouri River near Craig, Montana.

The Coalition is a nonprofit Montana corporation formed to promote public access to Montana's rivers. Individual members of the Coalition use the stretch of the Dearborn running through Curran's property for recreational pursuits

2

such as floating and fishing. Some members of the Coalition who have floated or attempted to float the Dearborn have experienced interference and harassment from Curran or his agents.

Curran and Curran Oil Co., of which he is a principal stockholder, have extensive land holdings in Lewis and Clark and Cascade Counties. Curran also holds leases to some state lands through which the Dearborn flows. Approximately six to seven miles of the Dearborn flows through property owned or controlled by Curran. About four and one-half sections of Curran's land on the Dearborn are immediately upstream from the point at which U.S. Highway 287 crosses the Dearborn and about six and one-half sections, including one isolated section, are downstream from Highway 287.

Curran claims title to the banks and streambed of a portion of the Dearborn River and claims to have the right, as an owner of private property, to restrict its use.

The District Court essentially held that the Dearborn River is in fact navigable for recreation purposes under Montana law; that recreation access to it is determined by state law according to one criterion--namely, navigability for recreation purposes; and that the question of recreational access is to be determined according to state, not federal, law.

The following issues are raised by the parties:

1. Whether the District Court erred in its application of the federal test of navigability for title purposes.

2. Whether the District Court erred in granting summary judgment on the issue of navigability of the Dearborn.

3. Whether the District Court erred in determining that recreational use and fishing make a stream navigable.

4. Whether the District Court erred in dismissing Curran's counterclaim for inverse condemnation.

5. Whether the claims of the Coalition, the Department of Fish, Wildlife and Parks and the Department of State Lands should have been dismissed for failure to name indispensable parties under Rule 19, M.R.Civ.P.

6. Whether the Coalition has standing to bring this action.

7. Whether the District Court lacked subject matter jurisdiction.

8. Whether Montana has adopted the log-floating test of commercial navigability.

9. Whether the Dearborn River is navigable under the federal commercial use test.

I

The first issue to be addressed is whether the District Court erred in its application of the federal test of navigability for title purposes.

Curran maintains that the District Court erred by misconstruing the law to be applied in determining the navigability of the Dearborn at the time Montana was admitted to the Union.

The United States Supreme Court has held, and all parties agree, that federal law controls the issue of navigability for title purposes. Brewer-Elliott Oil and Gas Company v. United States (1922), 260 U.S. 77, 43 S.Ct. 60, 67 L.Ed. 140.

Federal law on navigability for title purposes provides that rivers are navigable in law which are navigable in fact. The Daniel Ball (1870), 77 U.S. (10 Wall.) 557, 19 L.Ed. 999.

4

"And they are navigable in fact when they are used, or are susceptible of being used, in their ordinary condition, as highways for commerce, over which trade and travel are or may be conducted in the customary modes of trade and travel on water." The Daniel Ball, supra, at 563. In 1874, the United States Supreme Court elaborated on its holding in The Daniel Ball, supra, and stated that ". . . the true test of navigability of a stream does not depend on the mode by which commerce is, or may be, conducted, nor the difficulties attending navigation. If this were so, the public would be deprived of the use of many of the large rivers of the country. . . The capability of use by the public for purposes of transportation and commerce affords the true criterion of the navigability of a river, rather than the extent and manner of that use." The Montello (1874), 87 U.S. (20 Wall.) 430, 87 L.Ed. 391.

Navigability in fact under federal law can be determined by the log-floating test. The Montello, supra; Sierra Pacific Power Co. v. Federal Energy Regulatory Commission (9th Cir. 1982), 681 F.2d 1134, cert. denied, ___ U.S. ___, 103 S.Ct. 1769 (1983); State of Oregon v. Riverfront Protection Association (9th Cir. 1982), 672 F.2d 792. In Riverfront Protection Association, supra, the McKenzie River was declared navigable despite the fact that log drives could only be conducted during April, May and early June.

The evidence in this case, supplied by the affidavits of two competent historians, demonstrates that the Dearborn River was used in 1887, two years before Montana statehood, to float approximately 100,000 railroad ties. Furthermore, in 1888 and 1889, one or two log drives per year were floated down the Dearborn. One drive in 1888 contained 700,000 board

5

feet. Clearly the Dearborn satisfied the log-floating test for navigability under the federal test of navigability for title purposes.

Since the Dearborn was navigable under the log-floating test at the time of statehood in 1889, title to the riverbed was owned by the federal government prior to statehood and was transferred to the State of Montana upon admission to the Union.

The landmark case dealing with state and federal ownership of beds underlying navigable waters is Martin v. Waddell (1842), 41 U.S. (16 Pet.) 367, 10 L.Ed. 997. In delivering the opinion of the Court, Mr. Chief Justice Taney stated, "For when the Revolution took place, the people of each state became themselves sovereign; and in that character hold the absolute right to all their navigable waters and the soils under them for their own common use, subject only to the rights since surrendered by the constitution to the general government." Waddell, supra.

Under English common law, the crown owned only the beds of waters which were (1) below the high water mark, (2) navigable and (3) affected by the ebb and flow of the tide. Title to nontidal beds was prima facie in the owner of the share to the thread of the stream, usque ad filum aquae. In 1851 the Supreme Court held that admiralty jurisdiction extended to nontidal waters. The Genesee Chief (1851), 53 U.S. (12 How.) 443, 13 L.Ed. 1058. In 1876, in Barney v. Keokuk (1876), 94 U.S. 324, 24 L.Ed. 224, Genesee Chief, supra, was applied to hold that the states owned the beds to nontidal navigable waters.

States admitted to the Union subsequent to the original thirteen succeeded to the same rights on the theory that the

6

lands acquired by the United States from the original thirteen colonies or from foreign governments were held in trust for the new states in order that they might be admitted on an equal footing with the original states. Pollard's Lessee v. Hagan (1845), 44 U.S. (3 How.) 212, 11 L.Ed. 565.

As far as treatment of the lands still in a territorial status, the federal government exercised sovereignity. In Shively v. Bowlby (1894), 152 U.S. 1, 48-50, 14 S.Ct. 548, 38 L.Ed. 331, the Supreme Court stated:

> "By the Constitution, as is now well settled, the United States, having rightfully acquired the Territories, and being the only government which can impose laws upon them, have the entire dominion and sovereignty, national and municipal, Federal and state, over all the Territories, so long as they remain in a territorial condition. [Citations omitted.]
>
> ". . .
>
> "The Congress of the United States, in disposing of the public lands, has constantly acted upon the theory that those lands, whether in the interior, or on the coast, above high water mark, may be taken up by actual occupants, in order to encourage the settlement of the country; but that the navigable waters and the soils under them, whether within or above the ebb and flow of the tide, shall be and remain public highways; and, being chiefly valuable for the public purposes of commerce, navigation and fishery, and for the improvements necessary to secure and promote those purposes, shall not be granted away during the period of territorial government; but, unless in case of some international duty or public exigency, shall be held by the United States in trust for the future States, and shall vest in the several States, when organized and admitted into the Union, with all the powers and prerogatives appertaining to the older States in regard to such waters and soils within their respective jurisdictions; in short, shall not be disposed of piecemeal to individuals as private property, but shall be held as a whole for the purpose of being ultimately administered and dealt with for the public benefit by the State, after it shall have

become a completely organized community."
(Emphasis added.)

In addition, Patton on Titles states that as a further attribute of sovereignty, the states have assumed for many years the power to determine as a matter of local law the question of what waters are navigable, Hardin v. Jordan (1891), 140 U.S. 371, 11 S.Ct. 808, 35 L.Ed. 428, and the boundary therein between state and private ownership. Pollard's Lessee v. Hagan (1844), 44 U.S. (3 How.) 212, 11 L.Ed. 565. "During the time that the United States holds country as a territory, it can, as the holder of local sovereignty, make [the determination between state and private ownership]. However, it has never done so, with the natural assumption that it had left the matter for the control of each state when organized and admitted to the union." 1 Patton on Titles, § 129 (1957), citing Shively v. Bowlby, 152 U.S. at 58. (Emphasis added.)

Of further importance to the issue of navigability for title is the Public Trust Doctrine. The theory underlying this doctrine can be traced from Roman Law through Magna Carta to present day decisions.

The Public Trust Doctrine was first clearly defined in Illinois Central Railroad v. Illinois (1892), 146 U.S. 387, 13 S.Ct. 110, 36 L.Ed. 1018. In this case the United States Supreme Court was called upon to determine whether the State of Illinois had the right to convey, by legislative grant, a portion of Chicago's harbor on Lake Michigan to the Illinois Central Railroad.

> "That the State holds the title to the
> lands under the navigable waters of Lake
> Michigan, within its limits, in the same
> manner that the State holds title to
> soils under tide water, by the common
> law, we have already shown, and that

8

title necessarily carries with it control over the waters above them whenever the lands are subjected to use. . . . It is a title held in trust for the people of the State that they may enjoy the navigation of the waters, carry on commerce over them, and have liberty of fishing therein freed from the obstruction or interference of private parties. . . The trust devolving upon the State for the public, and which can only be discharged by the management and control of property in which the public has an interest, cannot be relinquished by a transfer of the property. The control of the State for the purposes of the trust can never be lost, except as to such parcels as are used in promoting the interests of the public therein, or can be disposed of without any substantial impairment of the public interest in the lands and waters remaining. . . <u>The State can no more abdicate its trust over property in which the whole people are interested, like navigable waters and soils under them, so as to leave them entirely under the use and control of private parties, except in the instance of parcels mentioned for the improvement of the navigation and use of the waters, or when parcels can be disposed of without impairment of the public interest in what remains, than it can abdicate its police powers in the administration of government and the preservation of the peace.</u>" (Emphasis added.) <u>Illinois Central</u>, 146 U.S. at 452-453.

In summary, the "equal-footing" doctrine as set forth in <u>Pollard's Lessee</u>, supra, which held that the federal government retained title to navigable waters so that all states entering the Union subsequent to the original thirteen would enter on an "equal footing" and the Public Trust Doctrine, which provides that states hold title to navigable waterways in trust for the public benefit and use are two important doctrines to be considered in determining a navigability-for-title question. In this matter, the log-floating test was properly applied and the State found to hold title to the riverbed of the Dearborn. In this matter, where title to the bed of the Dearborn rests with the State,

the test of navigability for use and not for title, is a test to be determined under state law and not federal law.

Curran maintains that he holds title to the riverbed by virtue of a patent issued to his predecessor-in-title. However, the issue of the patent was not raised before the District Court and was only presented on appeal to this Court. Consequently, we decline to rule upon the matter of the patent.

## II

The second issue to be considered is whether the District Court erred in granting summary judgment on the issue of navigability of the Dearborn River.

We find no error in the granting of the summary judgment. The affidavits and depositions of the historians are admissible in evidence under the Montana Rules of Evidence. The historians qualified as expert witnesses and their testimony provided evidence of the history of the Dearborn. Their affidavits and depositions also disclose circumstantial guarantees of trustworthiness. The facts and data relied upon by these experts was of a type reasonably relied upon by experts in their field, and under those circumstances, need not be admissible in evidence. Rule 703, Mont.R.Evid.

Such was not the case with regard to the affidavits of Curran's witnesses. These affidavits were worthless under our rules of evidence, did not create any genuine issue of material fact concerning the navigability of the Dearborn River at the time of Montana's statehood and are not admissible in evidence on this issue.

Furthermore, Curran filed a motion for summary judgment on plaintiff's claim that the Dearborn River is a public way,

that the public has a right to enter on his lands between the high water marks for recreational purposes, and that Art. IX, Sec. 3, of the Montana Constitution provides plaintiff the right to use the Dearborn. The motion for summary judgment on these issues states that there is no genuine issue of material fact on the issues and that Curran is entitled to judgment as a matter of law. This is contrary to the position he takes on appeal.

## III

The third issue is whether the District Court erred in determining that recreational use and fishing make a stream navigable. We find no error.

The concept of determining navigability based upon public recreational use is not new. One of the earlier cases, decided in 1893, held:

> ". . . The division of waters into navigable and nonnavigable is but a way of dividing them into public and private waters,--a classification which, in some form, every civilized nation has recognized; the line of division being largely determined by its conditions and habits. In early times, about the only use--except, perhaps, fishing,--to which the people of England had occasion to put public waters, and about the only use to which such waters were adapted, was navigation, and the only waters suited to that purpose were those in which the tide ebbed and flowed. Hence, the common law very naturally divided waters into navigable and nonnavigable, and made the ebb and flow of the tide the test of navigability. In this country, while still retaining the common-law classification of navigable and nonnavigable, we have, in view of our changed conditions, rejected its test of navigability, and adopted in its place that of navigability in fact; and, while still adhering to navigability as the the criterion whether waters are public or private, yet we have extended the meaning of that term so as to declare all waters public highways which afford a

11

channel for any useful commerce, including small streams, merely floatable for logs at certain seasons of the year. Most of the definitions of 'navigability' in the decided cases, while perhaps conceding that the size of the boats or vessels is not important, and, indeed, that it is not necessary that navigation should be by boats at all, yet seem to convey the idea that the water must be capable of some commerce of pecuniary value, as distinguished from boating for mere pleasure. But if, under present conditions of society, bodies of water are used for public uses other than mere commercial navigation, in its ordinary sense, we fail to see why they ought not to be held to be public waters, or navigable waters, if the old nonmenclature is preferred. Certainly, we do not see why boating or sailing for pleasure should not be considered navigation, as well as boating for mere pecuniary profit. Many, if not the most, of the meandered lakes of this state, are not adapted to, and probably will never be used to any great extent for, commercial navigation; but they are used--and as population increases, and towns and cities are built up in their vicinity, will be still more used--by the people for sailing, rowing, fishing, fowling, bathing, skating, taking water for domestic, agricultural, and even city purposes, cutting ice, and other public purposes which cannot now be enumerated or even anticipated. To hand over all these lakes to private ownership, under any old or narrow test of navigability, would be a great wrong upon the public for all time, the extent of which cannot, perhaps, be now even anticipated. . . " (Emphasis added.) Lamprey v. State (Metcalf) (1893), 52 Minn. 181, 53 N.W. 1139, 1143.

Since 1893, the concept expressed in Lamprey has been followed and the idea of navigability for public recreational use has spread to numerous other jurisdictions. According to Albert W. Stone, a professor of Law at the University of Montana and an acknowledged expert in the field of Water Law, there is a tendency in adjudicated cases from other jurisdictions to abandon the tool of defining "navigability" and simply directing the inquiry to whether the water is

susceptible to public use.  Under this concept, the question

of title to the underlying streambed is irrelevant.  A. W.

Stone, _Montana Water Law for the 1980's_ (1981).  Thus, the

issue becomes one of use, not title.

Navigability for use is a matter governed by state law.

It is a separate concept from the federal question of deter-

mining navigability for title purposes.

> ". . . The Propeller Genesee Chief [The
> Propeller Genesee Chief v. Fitzhugh,
> (1851) 53 U.S. (12 How.) 443, 13 L.Ed.
> 1058], Gibbons v. Ogden [(1824) 22 U.S.
> (9 Wheat.) 1, 6 L.Ed. 23], and the Daniel
> Ball [(1870) 77 U.S. (10 Wall.) 557, 19
> L.Ed. 999] established the basic test for
> public waters for the purposes of our
> federal system.  But the problems of
> federalism are not the same as the prob-
> lems which may arise entirely within a
> state; the federal test for land-title
> and federal jurisdiction does not have to
> be the test for state determinations of
> the waters that are public for various
> state purposes."   1 Waters and Water
> Rights (Clark Ed.) pgs 212-213, (1967).
> (Footnotes omitted.)

In 1961, the Wyoming Supreme Court supported public use

of waters suitable therefor without regard to title or navi-

gability.  The Court held:

> "Irrespective of the ownership of the bed
> or channel of waters, and irrespective of
> their navigability, the public has the
> right to use public waters of this State
> for floating usable craft and that use
> may not be interfered with or curtailed
> by any landowner.  It is also the right
> of the public while so lawfully floating
> in the State's waters to lawfully hunt or
> fish or do any and all other things which
> are not otherwise made unlawful."  Day v.
> Armstrong (Wyo. 1961), 362 P.2d 137, 147.

In essence, the Wyoming court held that public recrea-

tional use of waters was limited only by the susceptibility

of the waters for that purpose.

The Constitution of Montana provides:

13

"All surface, underground, flood, and atmospheric waters within the boundaries of the state are the property of the state for the use of its people and are subject to appropriation for beneficial uses as provided by law."

Thus, Curran has no right to control the use of the surface waters of the Dearborn to the exclusion of the public except to the extent of his prior appropriation of part of the water for irrigation purposes, which is not at issue here. Curran has no right of ownership to the riverbed or surface waters because their ownership was held by the federal government prior to statehood in trust for the people. Upon statehood, title was transferred to the State, burdened by this public trust.

In essence, the question is whether the waters owned by the State under the Constitution are susceptible to recreational use by the public. The capability of use of the waters for recreational purposes determines their availability for recreational use by the public. Streambed ownership by a private party is irrelevant. If the waters are owned by the State and held in trust for the people by the State, no private party may bar the use of those waters by the people. The Constitution and the public trust doctrine do not permit a private party to interfere with the public's right to recreational use of the surface of the State's waters.

Curran has also raised questions regarding ex post facto laws, violation of the contract clause, and irrevocable rights and privileges. However, since Curran has no title to the streambed or right to exclude the public from use of the surface waters of the Dearborn for recreational purposes, these matters are not germane to this case.

Curran primarily relies on the Montana case of Herrin v. Sutherland (1925), 74 Mont. 587, 241 P. 328, to support his argument against the recreational use of the Dearborn by members of the public. In that case, the Court stated that Fall Creek, a tributary of the Missouri, was not a navigable stream and anyone who waded up the creek was a trespasser. This holding is irrelevant for at least three reasons: (1) Fall Creek is a nonnavigable stream, at least according to Curran, and therefore has no application to this case; (2) the holding is purely dicta, has no precedential value and may be disregarded; and (3) the holding is contrary to the public trust doctrine and the 1972 Montana Constitution.

In sum, we hold that, under the public trust doctrine and the 1972 Montana Constitution, any surface waters that are capable of recreational use may be so used by the public without regard to streambed ownership or navigability for nonrecreational purposes.

IV

The next issue is whether the District Court erred in dismissing Curran's counterclaim for inverse condemnation.

The counterclaim for inverse condemnation was based upon Curran's claim to ownership of the riverbed of the Dearborn. However, the question of title to the bed is irrelevant to determination of navigability for use, and Curran has no claim to the waters. Since there is no claim to the waters, there is no taking and, therefore, no grounds for an inverse condemnation claim. Consequently, we find that the District Court did not err in dismissing the claim.

15

V

The fifth issue is whether the claims of the Coalition, the Department of Fish, Wildlife and Parks and the Department of State Lands should have been dismissed for failure to join indispensable parties under Rule 19, M.R.Civ.P.

This issue was first raised by Curran on appeal. We note, however, that Montana's rule pertaining to this matter is in its relevant aspects substantially the same as the comparable federal rule and the federal courts have long held that ". . . when litigation seeks the vindication of a public right, third persons who may be adversely affected by a decision favorable to plaintiff do not thereby become indispensable parties." Natural Resources Defense Council, Inc. v. Berklund (D.D.C. 1978), 458 F.Supp. 925, 933 (citing National Licorice Co. v. NLRB (1940), 309 U.S. 350, 60 S.Ct. 569, 84 L.Ed. 799).


VI

The next issue raised is whether the Coalition had standing to bring this matter.

We conclude that question is immaterial since the Montana Department of Fish, Wildlife and Parks and the Department of State Lands are also parties in this action.


VII

The seventh issue is whether the District Court lacked subject matter jurisdiction.

Curran's argument is based solely on the presumption that he holds title to the riverbed and argues that a state has no power to strip him of title to that land under the

16

quise of determining navigability of the waters over that riverbed.

We find this issue lacks merit because it is based on Curran's claim of title which is nonexistent. As discussed previously in greater detail, the State holds title to the riverbed and the waters flowing over it so there is no question of the subject matter jurisdiction of the District Court.

## VIII

The eighth issue is whether Montana has adopted the log-floating test of commercial navigability.

This issue was raised by Curran but is immaterial. The question here is one of recreational use or navigability, not commercial navigability.

## IX

The last issue is whether the Dearborn River is navigable under the federal commercial use test.

This issue is also immaterial to determining the question of navigability for recreational purposes under Montana state law.

## X

We add the cautionary note that nothing herein contained in this opinion shall be construed as granting the public the right to enter upon or cross over private property to reach the State-owned waters hereby held available for recreational purposes.

The limit to the public's right to use these waters is, under normal circumstances, the high water mark of the waters.

17

While section 70-16-201, MCA, provides for private ownership of the adjacent lands to the low water mark, the "angling statute," section 87-2-305, MCA, recognizes a public right to access for fishing purposes to the high water mark. Further, in Gibson v. Kelly (1895), 39 P. 517, 15 Mont. 417, this Court recognized a public right to access for fishing and navigational purposes to the point of the high water mark. Therefore, we hold that the public has a right to use the state-owned waters to the point of the high water mark except to the extent of barriers in the waters. In case of barriers, the public is allowed to portage around such barriers in the least intrusive way possible, avoiding damage to the private property holder's rights.

XI

In summary, we hold the following:

(1) That the District Court did not err in its application of the federal test for title purposes but that the question of title of the underlying bed is immaterial in determining public recreational use of State-owned waters.

(2) That the District Court did not err in granting summary judgment on the issue of navigability of the Dearborn.

(3) That the District Court was correct in holding that State-owned water of the Dearborn is navigable for recreational purposes. We further hold that under the public trust doctrine and the Montana Constitution, any surface waters capable of use for recreational purposes are available for such purposes by the public, irrespective of streambed ownership.

(4)  That there was no error in dismissing the claim for inverse condemnation; there was no taking and therefore there is no basis for an inverse condemnation claim.

(5)  That the question of the Coalition's standing is immaterial to this matter.

(6)  That the District Court did not err in failing to dismiss the claims of the Coalition, the Department of Fish, Wildlife and Parks, and the Department of State Lands for failure to name indispensable parties because when litigation seeks vindication of a public right, the persons who may be adversely affected by a decision favorable to the plaintiff do not thereby become indispensable parties.

(7)  That the District Court did not lack subject matter jurisdiction in this case.

(8)  That whether Montana has adopted the log-floating test of commercial navigability or whether the Dearborn River is navigable under the federal commercial use test is immaterial because at issue here is the public's right to recreational use and this is determined according to Montana state law.

(9)  That the public's right to use the State-owned waters is restricted to the area between the high water marks and may only cross private property in order to portage around barriers in the water; the right to portage must be accomplished in the least intrusive manner possible.

(10) That the public do not have the right to enter into or trespass across private property in order to enjoy the recreational use of State-owned waters.

Affirmed.

_____
Chief Justice

19

We concur:

_John Conway Harrison_

_Daniel J. Shea_

_Wm. R. Morrison_

_John C. Sheehy_

_Frank I. Haswell_

Justices

Mr. Justice L. C. Gulbrandson dissenting.

I respectfully dissent.

The trial court and this Court have accepted the evidence presented by the plaintiffs at a summary judgment hearing as conclusive on the issue of navigability and have summarily discarded the defendant's evidence as worthless and inadmissible.

In my view, defendant's evidence was sufficient to show that a genuine issue of material fact existed, under the authority of United States v. Rio Grande Dam & Irr. Co. (1899), 174 U.S. 690, 19 S.Ct. 770, 43 L.Ed. 1136, and Puget Sound Power & Light v. Fed. Energy Reg. Comm'n (1981), 644 F.2d 785, and therefore, the disposition of this case by summary judgment was improper. The matter should be remanded for trial by jury.

Assuming, arguendo, that the Dearborn River was navigable in fact, then the issues in this case can be resolved by application of existing law. There was no necessity for the trial court to hold, and for this Court to affirm, that recreational use and fishing make the Dearborn River navigable.

By adopting the recreational use test, with potential statewide application, where the issues before the court do not require its adoption, this Court appears to be acting legislatively, instead of judicially, and may be creating a procedure whereby valuable property rights are condemned and taken without payment of compensation.

_L. C. Gulbrandson_
Justice

21

Hon. Frank I. Haswell
Chief Justice, Supreme Court
Room 414 Justice Building
215 North Sanders
Helena, Montana  59620

CORRECTION. In preparing this opinion for pub-
lication, we noted in our verification of titles and
citations the matters listed below. Corrections have
been made on our copy of the opinion.

Date:

Re:    July 9, 1984

       Montana Coalition for Stream Access, Inc. v. Curran, No. 83-164, May
       15, 1984

       Page 2, line 1 - - - Rule 54(b) should read Rule 56(b).

       Page 5, line 16 - - - 87 L.Ed. 391 should read 22 L.Ed. 391.

*Rule 54(b) is correct. Please do not change.*
*Kristen Cassidy, Law Clerk*

WEST PUBLISHING COMPANY
Box 3526
St. Paul, MN 55165