MR. JUSTICE HUNT,
dissenting:
I dissent. The majority finds Sections 23-2-301, et seq., MCA, an impermissible enlargement of the public trust doctrine and this Court’s holdings in Montana Coalition for Stream Access, Inc. v. Curran (Mont. 1984), [210 Mont. 38,] 682 P.2d 163, 41 St. Rep. 906, and Montana Coalition for Stream Access, Inc. v. Hildreth (Mont. 1984), [211 Mont. 29,] 684 P.2d 1088, 41 St.Rep. 1192. They describe in some detail the evils they foresee if the public uses the streambed up to the high water mark in a “convenient, productive, and comfortable” way. While they acknowledge the public’s right to use the streambed, and reject appellant’s claim that the public may only use the surface of the water, they find the use permitted by Sections 23-2-301, et seq., MCA, give the public rights that are not necessary to utilize the stream or river.
I do not agree that this is so but if it is then it is a question for the legislature to solve as experience teaches how we can best balance the rights of the landowner and the public.
The issues addressed by the majority opinion are not properly before this Court. They were not raised at the District Court level nor on appeal. The appellants filed an action for declaratory judgment alleging that Sections 23-2-301 through 23-2-322, MCA (H.B. 265) were unconstitutional as a taking of private property for public use without the landowner’s consent or just compensation.
In the District Court and on this appeal appellants raised these three issues:
1. Whether H.B. 265 operates as a taking of private property for the public purpose of recreational uses without providing just compensation for the taking.
2. Whether H.B. 265 is constitutionally deficient because it failed to include in its title any reference to or any reasonable reference to *152 the fact that private property was being committed to the public purpose of recreational uses without just compensation, and without the consent of the landowner.
3. Whether the District Court erred in not finding H.B. 265 unconstitutional in part.
The issues raised by appellants and briefed by respondents on appeal are clearly res judicata under this Court’s decisions in Curran, 682 P.2d 163, 41 St.Rep. 906, and Hildreth, 684 P.2d 1088, 41 St.Rep. 1192. In both of those opinions we upheld the dismissal of the defendant’s counterclaims for inverse condemnation based on the theory there had been a taking of land without compensation. In discussing this issue in Curran we pointed out the provision in the Montana Constitution that applied and discussed its application as follows:
“All surface, underground, flood, and atmospheric waters within the boundaries of the state are the property of the state for the use of its people and are subject to appropriation for beneficial uses as provided by law.” [Art. IX, Section 3(3), 1972 Mont. Const.]
“Thus, Curran has no right to control the use of the surface waters of the Dearborn to the exclusion of the public except to the extent of his prior appropriation of part of the water for irrigation purposes, which is not at issue here. Curran has no right of ownership to the riverbed or surface waters because their ownership was held by the federal government prior to statehood in trust for the people. Upon statehood, title was transferred to the State, burdened by this public trust.
“In essence, the question is whether the waters owned by the State under the Constitution are susceptible to recreational use by the public. The capability of use of the waters for recreational purposes determines their availability for recreational use by the public. Streambed ownership by a private party is irrelevant. If the waters are owned by the State and held in trust for the people by the State, no private party may bar the use of those waters by the people. The Constitution and the public trust doctrine do not permit a private party to interfere with the public’s right to recreational use of the surface of the State’s waters.”
Curran, at 170, 41 St.Rep. at 914.
In Hildreth, we again considered the issue and said:
“Hildreth’s claim for inverse condemnation is based upon the theory that there has been a taking of his land without compensation. Such is not the case. Public use of the waters and the bed and banks *153 of the Beaverhead up to the ordinary high water mark was determined, not title. (Emphasis in original.)”
Hildreth, at 1093, 41 St.Rep. at 1197.
H.B. 265 represents a legislative enactment that attempts to reconcile the conflicting interests of recreationalists and landowners, within the ambits of the law as set out by this Court in Curran and Hildreth.
The District Court provided us with an excellent analysis of the launching and ultimate enactment of H.B. 265. This dissent adopts that portion of District Court’s Opinion and Order as follows:
“C. House Bill 265
“The minutes of the meeting of the Senate Judiciary Committee on March 8, 1985 relate some of the history of House Bill 265 as follows:
“ ‘Representative Bob Ream, sponsor of H.B. 265, introduced the bill to the Committee and traced a bit of its history. There were a variety of bills on stream access last [1983] legislative session. Because of the uncertainty regarding the Hildreth and Curran Supreme Court decisions at that point in time, Representative Keyser sponsored a resolution requesting an interim study. The interim committee provided a public forum for this issue. People began to realize it wasn’t a black and white situation; there were areas of gray in between on which people were going to have to compromise. Both sides realized they would have to come up with a bill to ameliorate some of their concerns. This is not a committee bill, but a bill on which the two sides got together in the months before the session began and hammered it out. The bill was before the House Judiciary Committee, which appointed a subcommittee headed by Representative Keyser. There was an attempt to involve both sides in the decision making on the amendments made by the subcommittee .... The goal of the subcommittee was to keep House Bill 265 within the bounds of the Supreme Court decisions and to express the Legislature’s desire to tie down and define the areas that were left very broad in those decisions.”
As Judge Loble pointed out, many organizations were instrumental in supporting this bill. For example the Montana Stockgrowers Association and members of the agricultural industry alliance, consisting of the Montana Stockgrowers Association, Montana Wool Growers Association, Montana Association of State Grazing Districts, *154 Montana Cowbelles, Montana Farmers Union, Montana Cattlemen’s Association, Montana Cattle Feeders Association, Montana Farm Bureau Federation, Montana Water Development Association, Women Involved in Farm Economics, and the Agricultural Preservation Association, supported passage of H.B. 265.
Their position was set forth very clearly in a written statement submitted to the committee and it is set forth here:
“While the suits [Curran and Hildreth] were pending on appeal to the Supreme Court of Montana, the 1983 Legislature considered a variety of stream access legislation. Those efforts failed in deference to the appellate process. In May and June of 1984, the Supreme Court of Montana rendered two broad, sweeping decisions which allowed the public the right to use all state waters for any recreational and incidental uses. The use right was extended to the high water mark on all streams regardless of size. The decisions did not attempt to provide definition to many of the terms and rights extended, inviting a legislative response.
“Fortunately the 1983 Legislature had created an interim study committee to receive testimony and propose legislation. The interim committee met both before and after the Supreme Court of Montana decisions and considered primary and collateral issues raised by the decided cases.
“The interim committee gave thoughtful deliberation to the issue and developed House Bill 16 which became the catalyst for the remaining legislation being considered by this committee. It is fair to say that absent these actions the later activities of the agricultural community, working in conjunction with recreationalists and the Department of Fish, Wildlife and Parks, would have never occurred.
“As the interim committee’s action drew to a close, landowner groups met to outline the goals for upcoming legislation and to plan for [the 1985] session. All groups agreed that it was critical to pass legislation this session, both to define areas left unclear by the Supreme Court of Montana’s decisions, to allay the fears of landowners and recreationalists, and to avoid conflict as the newly won rights were tested and applied to specific streams other than the streams subject to the litigation.
“To pass legislation which would be sustained in the event of a court challenge required an analysis of the limits of the Supreme Court of Montana decisions and a determination to propose legislation within those limitations. Six major goals were identified ....
“House Bill 265 addresses all of these concerns within the limita *155 tions imposed by the decisions of the Supreme Court of Montana. While the result reached in those decisions were not to the liking of most landowners, it is irresponsible to ignore those decisions or to propose legislation which is not cognizant of the opinions of the court. The Supreme Court of Montana, the third branch of state government, construing the Constitution of Montana, has declared rights to exist in the public which protect the continued recreational use of all waters of the state. Absent passage of a constitutional amendment restricting those rights, legislation which failed to abide by those decisions and the Montana Constitution would probably be declared void. There is little gained in passing legislation which is constitutionally flawed and likely to be declared void if challenged. Thus, while landowner grounds appreciated the sincere efforts brought to the debate and drafting of both House Bill 16 and House Bill 275, they concluded alternative legislation was needed which addressed the major goals identified and did so in a vehicle [H.B. 265] which would likely pass court challenge.”
[Written testimony of Ron Waterman, dated January 22, 1985.]
In my opinion, the District Court correctly concluded that the very point decided in Curran and Hildreth is the issue in this case and that Section 23-2-302, MCA, was the legislation that constitutionally responded to these opinions and it was left with nothing to do but grant defendant’s motion for summary judgment.