MR. JUSTICE SHEEHY,
dissenting:
I concur in the dissent of Mr. Justice William E. Hunt, Sr. and have further remarks to make.
The best that can be said of the majority opinion is that as to the recreational use of waters, it has certainly muddied the waters. When one reads the majority opinion in the light of Curran (1984), 682 P.2d 163, 41 St.Rep. 906, and Hildreth (1984), 684 P.2d 1088, 41 St.Rep. 1192, one can only conclude that the law respecting the correlative rights of landowners and recreational water users in Montana is adrift in a sea of confusion.
I. THE STATUTES ON THE RECREATIONAL USE OF STREAMS
Following our decisions in Curran and Hildreth, the legislature met in 1985. One of the principal subjects attacked by the legislature in 1985 was the enactment of laws that would define the rights *156 of recreational water users with respect to adjoining landowners. The legislation was vigorously argued, and the resulting statutes incorporated in Title 23, Chapter 2, Part 3 represent a legislative enactment that balanced the contending arguments of the interested parties. The legislation shows that it was founded on a proper interpretation of Curran and Hildreth, in a field where the interpretation by the legislature was proper. This Court has no business interfering or setting legislation aside where the legislature has properly acted within its distinctive sphere.
For ease of discussion, rather than setting out the statutes in haec verba, it is suitable to paraphrase what the legislature has done, and to set out with particularity those portions which the majority have confused.
First, the legislation refers to surface waters, and streams. It has no applicability to lakes. “Surface water” was defined for the purpose of recreational use to include a natural water body, its bed and its banks up to the ordinary high water mark. Section 23-2-301(12), MCA. By defining “surface water” to include the water itself and its stream bed up to the high water mark, the legislature was following the law as expostulated in Curran and Hildreth, as will be shown later in this dissent.
The legislature also defined “recreational use” to include fishing, hunting, swimming, floating, boating, and “other water related pleasure activities, and related unavoidable or incidental uses.” Section 23-2-301(10), MCA.
An important part of the legislation is the division by the legislature of surface waters into classes. Class I waters essentially are defined as those waters that are recognized as navigable or have been judicially determined as navigable or are capable of supporting commercial activities. All other surface waters are designated Class II waters. Sections 23-2-301(2), (3), MCA.
Recreational uses are permitted in Section 23-2-302. More specific reference well be made to those hereunder.
II. TITLE TO STREAMBEDS
The glaring defect in the majority opinion is that although it purports to support the public trust doctrine enunciated in Curran and Hildreth, it finds the public’s right to use those waters to be something in the nature of an easement. Such a concept of ownership or right of use is in derogation of the public trust doctrine because *157 under the doctrine the title to the streambed up to the high water mark resides in the state, and while the state may regulate the public use of streambeds under its ownership, it may not deed away the ownership of the streambeds. As to Class I streambeds, the concept of a mere easement right in the public must fail. The state has title.
In Curran, the majority pointed Out that under Schively v. Bowlby (1894), 152 U.S. 1, 48-50, 14 S.Ct. 548, 566, 38 L.Ed.2d 331, the Supreme Court stated:
“The Congress of the United States, in disposing of the public lands, has constantly acted on the theory that those lands, whether in the interior, or on the coast, above high water mark, may be taken up by actual occupants, in order to encourage the settlement country; but that the navigable waters and the soils under them, whether within or above the ebb and flow of the tide, shall be and remain public highways; and . . . shall not be granted away during the period of territorial government;. . . shall be held by the United States in trust for the future states, and shall vest in the several states, when organized and admitted into the union . . . but shall be held as a whole for the purpose of being ultimately administered and dealt with for the public benefit by the state, after it shall become a completely organized community. (Emphasis added.)”
682 P.2d at 167, 41 St.Rep. at 910.
We further pointed out in Curran that under the public trust doctrine as first enunciated in Illinois Central Railroad v. Illinois (1892), 146 U.S. 387, 13 S.Ct. 110, 36 L.Ed. 1018, the United States Supreme Court said
“. . . The trust devolving upon the state for the public, and which can only be discharged by the management and control be relinquished by a transfer of the property. The control of the state for the purposes of the trust except as such parcels as are used in promoting the interests of the public therein, or can be disposed of without any substantial impairment of the public interest in the lands and waters remaining. (Emphasis added.)’ ”
682 P.2d at 168, 41 St.Rep. at 911
The majority opinion has set out the provisions of Section 70-16-201, MCA, which purports to provide that the owners of land abounded by water take ownership to the low water mark. Under the public trust doctrine, such transfer of lands subject to the public trust under navigable streams cannot occur. “The control of the state for the purposes of the trust can never be lost.” Illinois Central Railroad, 146 U.S. at 387, 13 S.Ct. at 110, 36 L.Ed. at 1018.
*158 Section 17-16-201, MCA, was enacted in 1895, according to its history, although it probably pre-existed state government. Nevertheless, when defining fishing rights in 1933, the legislature provided in Section 87-2-305, MCA:
Navigable Waters Subject to fishing rights. Navigable rivers, sloughs, or streams between the lines of ordinary high water thereof of the State of Montana and all rivers, sloughs and streams flowing through any public lands of the state shall hereafter be public waters for the purpose of angling, and any rights of title to such streams of the land between the high water flow lines or within the meander lines of navigable streams shall be subject to the right of any person owning an anglers license of this state who desires to angle thereon or along their banks to go upon the same for such purpose.”
The definition by the legislature in 1933 of the right to use the streambeds up to the high water mark for the purpose of fishing is an indirect recognition of the legislature that Section 70-16-301, MCA, is not worth the paper it is written on insofar as it applies to the streambeds between high water marks on navigable streams.
Plainly, then, we held in Curran and that holding controls here:
“Curran has no right of ownership to the river bed or surface waters because their ownership was held by the federal government prior to statehood in trust for the people. Upon statehood, title was transferred to the state, burdened by this public trust.”
682 P.2d at 170, 41 St.Rep. at 914.
The retrenchment by the majority members from Curran to a position that the adjoining landowners on a stream owned the streambed subject to an easement is perplexing, Three of the majority members, Justices Morrison, Harrison and Weber signed the Curran opinion without a murmur of discontent. Justice Gulbrandson, in his dissent in Curran did not dispute the public trust doctrine theory of ownership in the state, but argued instead that summary judgment was improper on the test of navigability of the Dearborn River.
In Hildreth, we strongly reaffirmed Curran, saying:
“Under the 1972 Constitution, the only possible limitation of use can be the characteristics of the waters themselves. Therefore, no owner of property adjacent to state-owned waters has the right to control the use of those waters as they flow through his property. The public has the right to use the waters and the bed and banks up to the ordinary high water mark. Curran, supra. Further, as we held *159 in Curran, in case of barriers, the public is allowed to portage around such barriers in the least intrusive manner possible, avoiding damages to the adjacent owners property and his rights.”
Hildreth, 684 P.2d at 1091, 41 St.Rep. at 1195.
In Hildreth we determine that the landowner had not been deprived of a property right. We said:
“As discussed previously in this opinion and extensively in Curran, supra, ownership of the stream bed is irrelevant to determination of public use of the waters for recreational purposes. Navigability for recreational land use is limited, under the Montana Constitution, only by the capabilities of the waters themselves for such use. Hildreth has never owned and does not now own the waters of the Beaverhead River. Under Montana law, the public has the right to use the Beaverhead and its bed and bank up to the ordinary high water mark, with additional, narrowly limited rights to portage around barriers.”
684 P.2d at 1094, 41 St.Rep. at 1198.
In Hildreth, Justices Morrison, and Weber concurred. Justices Gulbrandson and Harrison dissented, partly on the ground that they would defer to the legislature in finding solutions to water use conflicts between landowners and recreational users. The legislature has now acted.
In the fairly recent case, Montana v. United States (1981), 450 U.S. 544, 101 S.Ct. 1245, 67 L.Ed.2d 493, reaffirmed the proposition that states when organized, own the title to the riverbeds of the navigable streams. The court said:
“The Crow Treaties in this case, like the Chippewa treaties in Holt State Bank, fail to overcome the established presumption that the beds of navigable rivers remain in trust for future states and pass to the new states when they assume sovereignty.”
450 U.S. at a553, 101 S.Ct. at 1252, 67 L.Ed. at 502.
The statement of the majority opinion therefore, that “we reaffirm well-established constitutional principals protecting property interest from confiscation” is ill-founded insofar as it applies to Class I streambeds. The adjoining property owners have no ownership interest in the streambeds of Class I waters and therefore, nothing is being confiscated. The major premise of the majority opinion is faulty. When the state legislature acts within its sphere to regulate the use of property which the state owns, we should respect the legislative discretion.
*160 III. BIG GAME HUNTING
The majority hold unconstitutional this portion of Section 23-2-302-(2), MCA:
“The right of the public to make recreational use of surface waters does not include, without permission or contractual arrangement with the legislature with the landowner:
“(d) Big game hunting except by long bow or shotgun when specifically authorized by the commission;
It has always been accepted that landowners may give permission to big game hunters to go on the landowners’ premises for big game hunting. The legislature in the above statute extended this requirement of permission from the landowner to the streambeds which the landowners do not own. If the requirement for the landowners’ permission were being attacked by a water recreational user we might have reason to declare that portion of the statute unconstitutional except for the fact the Department of Fish, Wildlife and Parks in any event has the right to control big game hunting. The statute confers no right to big game hunting or streambeds except by permission of the landlord. There is no unconstitutionality inherent in the provision.
IV. OVERNIGHT CAMPING AND DUCK BLINDS
What is said foregoing about the right of the state to control streambeds, particularly under Class I lands, would indicate that the legislature has a perfect right as owner to permit any sort of lawful activity on the portions of the lands that it owns. The majority finds that permitting a water recreational user to roll out his sleeping bag or set up his pup tent overnight is “overbroad.” Yet, these are legislative decisions, made by the legislature after public hearings and discussion. What was done was the legislature’s business and not ours.
V. THE RIGHT OF PORTAGE
The legislature provided for portage, at the same time as it defined recreational uses, by enacting Section 23-2-311, MCA. Paraphrasing that statute, the recreational user of surface waters is empowered to *161 portage around barriers in the least intrusive manner possible, avoiding damage to the landowner’s land. The landowner is permitted to create barriers across streams for land or water management or to establish boundary fences. No right of portage is granted if the barrier does not interfere with the public’s use of the surface waters. Either a recreational user or a landowner may request a portage route around or over a barrier to avoid damage to a landowner’s land. If an artificial barrier is placed by the landowner, the cost of establishing a portage route is borne by the landowner. If the barrier is not of the landowner’s doing, the Department of Fish, Wildlife and Parks pays the cost of the portage route. Once established, the Department must maintain the portage route. An arbitration panel is provided for in case the landowner or recreationalist disagree. The portage route is the exclusive means to portage over and around the barrier. No attempt was made by the legislature to establish portage routes for natural routes, as distinguished from artificial barriers.
Again, without distinguishing Class I waters, and without substantial discussion of the difference between Class I and Class II waters, the majority finds the provisions of Section 23-2-311, MCA, unconstitutional, insofar as the landowner must bear the cost of constructing a portage route.
The effect of this portion of the majority opinion is to give the landowner the go-ahead to construct artificial barriers across navigable waters which impede recreational use without cost. What we have said foregoing with respect to title serves to refute any possible logic in that position.
VI. CONCLUSION
I would uphold the constitutionality of the statutes in toto. The legislature, cognizant of its ownership rights and its duties as trustee of the public acted within its legislative discretion in adopting the statutes. There is no sound basis for our interference.