No. 86-178

IN THE SUPREME COURT OF THE STATE OF MONTANA

1986

_____

JACK E. GALT, et al.,

      Plaintiffs and Appellants,

-vs-

STATE OF MONTANA, acting by and
through the DEPARTMENT OF FISH,
WILDLIFE AND PARKS,

      Defendant and Respondent.

_____

APPEAL FROM:  District Court of the First Judicial District,
In and for the County of Lewis & Clark,
The Honorable Henry Loble, Judge presiding.

COUNSEL OF RECORD:

      For Appellant:

          Philip W. Strope argued, Helena, Montana

      For Respondent:

          Stan Bradshaw, Dept. Fish, Wildlife and Parks,
Helena, Montana
Poore, Roth & Robinson; Urban L. Roth argued,
Butte, Montana

      For Amicus Curiae:

          Charles F. Moses argued for Directors of T-Bone
Cattlewomens Assoc., et al., Billings, Montana

_____

                Submitted:  October 21, 1986

                Decided:  January 15, 1987

Filed: JAN 15 1987

_____
                Clerk

Mr. Justice Frank B. Morrison, Jr. delivered the Opinion of the Court.

Plaintiffs appeal the order of the First Judicial District Court granting summary judgment in favor of the defendant, State of Montana. We reverse.

In 1984, this Court decided the twin cases of Montana Coalition for Stream Access, Inc. v. Curran (Mont. 1984), 682 P.2d 163, 41 St.Rep. 906, and Montana Coalition for Stream Access, Inc., v. Hildreth (Mont. 1984), 684 P.2d 1088, 41 St.Rep. 1192. In Curran, we held that under the public trust doctrine as derived from the Montana Constitution the public has a right to use any surface waters capable of use for recreational purposes up to the high water marks and may portage around barriers in the water in the least intrusive manner possible. This holding was reaffirmed in Hildreth.

In response to these two decisions, the legislature enacted §§ 23-2-301, et.seq., MCA, addressing the recreational use of streams. Appellants, plaintiffs below, brought this action for declaratory relief pursuant to the Uniform Declaratory Judgment Act, §§ 27-8-101 through 27-8-313, MCA, requesting the District Court to declare §§ 23-2-301, et.seq., MCA, unconstitutional as a taking of private property without just compensation. The District Court upheld the constitutionality of the statutes and awarded summary judgment in favor of the State.

Addressing the constitutionality of §§ 23-2-301 et.seq., MCA, on appeal we frame the issues as follows:

1) Whether the public trust doctrine relating to water includes the use of adjoining land?

2) Whether §§ 23-2-301, et.seq., MCA, permit uses of the bed and banks and adjoining land beyond the scope of the public trust doctrine?

Appellants challenge the following sections as unconstitutional:

23-2-301. Definitions. For purposes of this part, the following definitions apply:

. . .

(2) "Class I waters" means surface waters, other than lakes, that:
(a) lie within the officially recorded federal government survey meander lines thereof;
(b) flow over lands that have been judicially determined to be owned by the state by reason of application of the federal navigability test for state streambed ownership;
(c) are or have been capable of supporting the following commercial activities: log floating, transportation of furs and skins, shipping, commercial guiding using multiperson watercraft, public transportation, or the transportation of merchandise, as these activities have been defined by published judicial opinion as of April 19, 1985; or
(d) are or have been capable of supporting commercial activity within the meaning of the federal navigability test for state streambed ownership
(3) "Class II waters" means all surface waters that are not class I waters, except lakes.

. . .

(12) "Surface water" means, for the purpose of determining the public's access for recreational use, a natural water body, its bed, and its banks up to the ordinary high-water mark.

23-2-302. Recreational use permitted -- limitations -- exceptions.
(1) Except as provided in subsections (2) through (5), all surface waters that are capable of recreational use may be so used by the public without regard to the ownership of the land underlying the waters.
(2) The right of the public to make recreational use of surface waters does not include, without permission or contractual arrangement with the landowner:
(a) the operation of all-terrain vehicles or other motorized vehicles not primarily designed for operation upon the water;

(b) the recreational use of surface waters in a stock pond or other private impoundment fed by an intermittently flowing natural watercourse;

(c) the recreational use of waters while diverted away from a natural water body for beneficial use pursuant to Title 85, chapter 2, part 2 or 3, except for impoundments or diverted waters to which the owner has provided public access;

(d) big game hunting except by long bow or shotgun when specifically authorized by the commission;

(e) overnight camping within sight of any occupied dwelling or within 500 yards of any occupied dwelling, whichever is less;

(f) the placement or creation of any permanent duck blind, boat moorage, or any seasonal or other objects within sight of or within 500 yards of an occupied dwelling, whichever is less; or

(g) use of a streambed as a right-of-way for any purpose when water is not flowing therein.

(3) The right of the public to make recreational use of class II waters does not include, without permission of the landowner:

(a) big game hunting;

(b) overnight camping;

(c) the placement or creation of any seasonal object; or

(d) other activities which are not primarily water-related pleasure activities as defined in 23-2-301(10). * * *

23-2-311. Right to portage -- establishment of portage route.

(1) A member of the public making recreational use of surface waters may, above the ordinary high-water mark, portage around barriers in the least intrusive manner possible, avoiding damage to the landowner's land and violation of his rights. * * *

(3)(e) The cost of establishing the portage route around artificial barriers must be borne by the involved landowner, except for the construction of notification signs of such route, which is the responsibility of the department. The cost of establishing a portage route around artificial barriers not owned by the landowner on whose land the portage route will be placed must be borne by the department. * * *

The public trust doctrine is found at Article IX, Section 3(3), of the Montana Constitution which provides:

All surface, underground, flood and atmospheric waters within the boundaries of the state are the property of the state for the use of its people and subject to appropriation for beneficial uses as provided by law.

Section 70-1-202, MCA, provides:

4

> Property of the state -- what included. The state is the owner of:
> (1) all land below the water of a navigable lake or stream;
> (2) all property lawfully appropriated by it to its own use;
> (3) all property dedicated or granted to the state; and
> (4) all property of which there is no other owner.

Section 70-16-201, MCA, states:

> Owner of land bounded by water. Except where the grant under which the land is held indicates a different intent, the owner of the land, when it borders upon a navigable lake or stream, takes to the edge of the lake or stream at low-water mark; when it borders upon any other water, the owner takes to the middle of the lake or stream.

As noted in Curran, supra, and Hildreth, supra, the constitutional provision clearly provides the State owns the waters for the benefit of its people. In those decisions, we further held that the public's right to use the waters includes the right of use of the bed and banks up to the high water mark even though the fee title in the land resides with the adjoining landowners. We did not define what kinds of use are permissible under the public trust doctrine.

The issue before us now is whether the public trust doctrine includes the types of use of the bed and banks found in §§ 23-2-301, et.seq., MCA. Section 23-2-302, MCA, has provided for a public right to build duck blinds, boat moorages, and camp overnight, so long as not within sight of or within 500 yards of an occupied dwelling, whichever is less.

The public trust doctrine in Montana's Constitution grants public ownership in water not in beds and banks of streams. While the public has the right to use the water for recreational purposes and minimal use of underlying and adjoining real estate essential to enjoyment of its ownership

5

in water, there is no attendant right that such use be as convenient, productive, and comfortable as possible.

The public has a right of use up to the high water mark, but only such use as is necessary to utilization of the water itself. We hold that any use of the bed and banks must be of minimal impact.

Appellants contend the right of public use set forth in the Curran and Hildreth decisions applies only to the surface of navigable streams. This is incorrect. In Hildreth we explicitly included the right to use of the bed and banks. 684 P.2d 1094, 41 St.Rep. 1199. In Curran, we adopted a recreational use test to determine navigability. Appellants apparently contend that the right of public use is restricted to Class I waters; i.e., those waters considered to be navigable under the federal test. This is not so. As we said in Curran, "The capability of use of the waters for recreational purposes determines their availability for recreational use by the public. Streambed ownership by a private party is irrelevant." 682 P.2d 170, 41 St.Rep. 914. The Montana Constitution makes no distinction between Class I and II waters. All waters are owned by the State for the use of its people.

Pursuant to § 23-2-302, MCA, overnight camping and construction of a duck blind are permissible within a few feet of an occupied dwelling so long as these activities are not "within sight". Similarly, a boat mooring could be placed directly in front of someone's home if obscured from vision.

Overnight camping is not always necessary for utilization of the water resource itself. The public can float and fish many of our rivers without camping overnight.

6

The statute is overbroad in giving the public right to a recreational use which is not necessary for the public's enjoyment of its water ownership. The same can be said of constructing permanent objects between high water marks. Although duck blinds may be necessary for enjoying the ownership interests in certain large bodies of water, the right to construct permanent improvements on any commercially navigable stream does not follow.

Big game hunting as authorized by § 23-2-302(d), between high water marks, is not permitted under any circumstances because it is not a necessary part of the easement granted the public for its enjoyment of the water. Further, although the recreational user has a right to portage around obstructions minimally impacting the adjoining landowner's fee interest, there can be no responsibility on behalf of the landowner to pay for such portage route. The landowner receives no benefit from the portage. The benefit flows to the public and the expense should be borne by the State.

We reaffirm well established constitutional principles protecting property interests from confiscation. Landowners, through whose property a water course flows as defined in Curran and Hildreth, supra, have their fee impressed with a dominant estate in favor of the public. This easement must be narrowly confined so that impact to beds and banks owned by private individuals is minimal. Only that use which is necessary for the public to enjoy its ownership of the water resource will be recognized as within the easement's scope. The real property interests of private landowners are important as are the public's property interest in water. Both are constitutionally protected. These competing

interests, when in conflict, must be reconciled to the extent possible.

Accordingly, we find § 23-2-302(2)(d), (e), and (f), MCA, to be unconstitutional. Further, we find § 23-2-311(3)(e), MCA, to be unconstitutional insofar as it requires the landowner to bear the cost of constructing a portage route around artificial barriers. The balance of the statutory scheme accords with the Montana Constitution and the opinions of this Court. We find the unconstitutional portions of the statute to be subject to severance and therefore, leave the balance of the statute intact.

We enter declaratory judgment in favor of appellants in accordance with the views herein expressed.

_____
Justice

We Concur:

_____
Chief Justice

_____

_____

_____

_____
Justices

8

Mr. Chief Justice J. A. Turnage, concurring remarks:

I have signed the majority opinion because I believe the result of the majority will offer some clarification to the existing law as well as remove unconstitutional provisions from the statutes.

I do not agree with all that has been said about the Public Trust Doctrine in this opinion and in the Curran and Hildreth decisions.

It was not then and it is not now necessary to resort to the theory of Public Trust Doctrine to find a right to the use of surface waters in this State for recreational purposes. This right, to whatever extent it may ultimately develop, is to be found in the express language of Article IX, Section 3(3) of the Montana Constitution, which provides:

> All surface, underground, flood and atmospheric waters within the boundaries of the state are the property of the state for the use of its people and subject to appropriation for beneficial uses as provided by law.

The Public Trust Doctrine is not expressly set forth in the Montana Constitution. It is a legal theory created by courts. This Court should not resort to creating or finding legal theories when a result can be reached from express constitutional language.

If the State of Montana is to be considered a trustee over waters of this State, or a trustee over any other property, under a Public Trust Doctrine, then the State must be held to the standard that applies to all trustees which standard requires that the trustee must own legal title to the property over which trust power is sought to be exercised.

Chief Justice

9

Mr. Justice L. C. Gulbrandson specially concurring:

I concur with the holding of the majority opinion that § 23-2-302(2)(d), (e), and (f), MCA, are unconstitutional. I would also hold that § 23-2-301(12), MCA, which defines "surface waters" as including "the bed and its banks up to the ordinary high-water mark" is unconstitutional as applied to Class II waters.

I would, in line with my dissents in the Curran and Hildreth decisions, request that this Court expunge from the Hildreth decision, the unsupported statement that "the public has the right to use [the bed and banks] up to the ordinary high water mark." Hildreth, 684 P.2d 1088, 1094. In my opinion, that statement is dicta. There was no legal authority for said statement, it was not necessary to decide the issue before the court, and it conflicts with the holding of the majority decision that only that use which is necessary for the public to enjoy its ownership of the water resource will be recognized. In support of this position, I cite Day v. Armstrong (Wyo. 1961), 362 P.2d 137, a case relied upon by the majority in Curran. In Curran, this Court stated:

> In 1961, the Wyoming Supreme Court supported public use of waters suitable therefor without regard to title or navigability. The Court held:
>
> "Irrespective of the ownership of the bed or channel of waters, and irrespective of their navigability, the public has the right to use public waters of this State for floating usable craft and that use may not be interfered with or curtailed by any landowner. It is also the right of the public while so lawfully floating in the State's waters to lawfully hunt or fish or do any and all other things which are not otherwise made unlawful." Day v. Armstrong (Wyo.1961), 362 P.2d 137, 147.

10

> In essence, the Wyoming court held that public recreational use of waters was limited only by the susceptibility of the waters for that purpose.

Curran, 682 P.2d 163, 170.

The Wyoming Supreme Court in Day further stated:

> When waters are able to float craft, they may be so used. When so floating craft, as a necessary incident to that use, the bed or channel of the waters may be unavoidably scraped or touched by the grounding of craft. Even a right to disembark and pull, push or carry over shoals, riffles and rapids accompanies this right of flotation as a necessary incident to the full enjoyment of the public's easement. . . . On the other hand, where the use of the bed or channel is more than incidental to the right of floating use of the waters, and the primary use is of the bed or channel rather than the floating use of the waters, such wading or walking is a trespass upon lands belonging to a riparian owner and is unlawful. Such trespass cannot be made lawful either by legislative or judicial action . . . Except as herein specified, to use the bed or channel of the river to wade or walk the stream remains an unlawful trespass.

Day, 362 P.2d 137, 145-46.

It is my opinion that where the State has title to the streambed, it may legislate, within the limits of declared public policy, the use of the streambed. Where the title to the streambed is privately owned, the State has no legal authority to legislate use of the bed and banks of that stream without paying just compensation through lawful eminent domain proceedings.

L. C. Brullbrandson
_____
Justice

11

Mr. Justice William E. Hunt, Sr., dissenting:

I dissent. The majority finds §§ 23-2-301, et seq., MCA, an impermissible enlargement of the public trust doctrine and this Court's holdings in Montana Coalition for Stream Access, Inc. v. Curran (Mont. 1984), 682 P.2d 163, 41 St.Rep. 906, and Montana Coalition for Stream Access, Inc. v. Hildreth (Mont. 1984), 684 P.2d 1088, 41 St.Rep. 1192. They describe in some detail the evils they foresee if the public uses the streambed up to the high water mark in a "convenient, productive, and comfortable" way. While they acknowledge the public's right to use the streambed, and reject appellant's claim that the public may only use the surface of the water, they find the use permitted by §§ 23-2-301, et seq., MCA give the public rights that are not necessary to utilize the stream or river.

I do not agree that this is so but if it is then it is a question for the legislature to solve as experience teaches how we can best balance the rights of the landowner and the public.

The issues addressed by the majority opinion are not properly before this Court. They were not raised at the District Court level nor on appeal. The appellants filed an action for declaratory judgment alleging that §§ 23-2-301 through 23-2-322, MCA (H.B. 265) were unconstitutional as a taking of private property for public use without the landowner's consent or just compensation.

In the District Court and on this appeal appellants raised these three issues:

12

1. Whether H.B. 265 operates as a taking of private property for the public purpose of recreational uses without providing just compensation for the taking.

2. Whether H.B. 265 is constitutionally deficient because it failed to include in its title any reference to or any reasonable reference to the fact that private property was being committed to the public purpose of recreational uses without just compensation, and without the consent of the landowner.

3. Whether the District Court erred in not finding H.B. 265 unconstitutional in part.

The issues raised by appellants and briefed by respondents on appeal are clearly res judicata under this Court's decisions in Curran, 682 P.2d 163, 41 St.Rep. 906, and Hildreth, 684 P.2d 1088, 41 St.Rep. 1192. In both of those opinions we upheld the dismissal of the defendant's counterclaims for inverse condemnation based on the theory there had been a taking of land without compensation. In discussing this issue in Curran we pointed out the provision in the Montana Constitution that applied and discussed its application as follows:

> "All surface, underground, flood, and atmospheric waters within the boundaries of the state are the property of the state for the use of its people and are subject to appropriation for beneficial uses as provided by law." [Art. IX, § 3(3), 1972 Mont. Const.]
>
> Thus, Curran has no right to control the use of the surface waters of the Dearborn to the exclusion of the public except to the extent of his prior appropriation of part of the water for irrigation purposes, which is not at issue here. Curran has no right of ownership to the riverbed or surface waters because their ownership was held by the federal government prior to statehood in trust for the people. Upon statehood, title was transferred to the State, burdened by this public trust.

13

In essence, the question is whether the waters owned by the State under the Constitution are susceptible to recreational use by the public. The capability of use of the waters for recreational purposes determines their availability for recreational use by the public. Streambed ownership by a private party is irrelevant. If the waters are owned by the State and held in trust for the people by the State, no private party may bar the use of those waters by the people. The Constitution and the public trust doctrine do not permit a private party to interfere with the public's right to recreational use of the surface of the State's waters.

Curran, at 170, 41 St.Rep. at 914.

In Hildreth, we again considered the issue and said:

Hildreth's claim for inverse condemnation is based upon the theory that there has been a taking of his land without compensation. Such is not the case. Public use of the waters and the bed and banks of the Beaverhead up to the ordinary high water mark was determined, not title. (Emphasis in original.)

Hildreth, at 1093, 41 St.Rep. at 1197.

H.B. 265 represents a legislative enactment that attempts to reconcile the conflicting interests of recreationalists and landowners, within the ambits of the law as set out by this Court in Curran and Hildreth.

The District Court provided us with an excellant analysis of the launching and ultimate enactment of H.B. 265. This dissent adopts that portion of District Court's Opinion and Order as follows:

C.  House Bill 265

The minutes of the meeting of the Senate Judiciary Committee on March 8, 1985 relate some of the history of House Bill 265 as follows:

"Representative Bob Ream, sponsor of HB 265, introduced the bill to the Committee and traced a bit of its history. There were a variety of bills on stream access last [1983] legislative session. Because of the uncertainty regarding the Hildreth and Curran Supreme Court decisions at that point in time, Representative Keyser sponsored a resolution requesting an interim study. The interim committee provided a public forum for this issue. People began to realize it wasn't a black and white situation; there were areas of gray in between on

14

which people were going to have to compromise. Both sides realized they would have to come up with a bill to ameliorate some of their concerns. This is not a committee bill, but a bill on which the two sides got together in the months before the session began and hammered it out. The bill was before the House Judiciary Committee, which appointed a subcommittee headed by Representative Keyser. There was an attempt to involve both sides in the decision making on the amendments made by the subcommittee.. . . The goal of the subcommittee was to keep House Bill 265 within the bounds of the Supreme Court decisions and to express the Legislature's desire to tie down and define the areas that were left very broad in those decisions."

As Judge Loble pointed out, many organizations were instrumental in supporting this bill. For example the Montana Stockgrowers Association and members of the agricultural industry alliance, consisting of the Montana Stockgrowers Association, Montana Wool Growers Association, Montana Association of State Grazing Districts, Montana Cowbelles, Montana Farmers Union, Montana Cattlemen's Association, Montana Cattle Feeders Association, Montana Farm Bureau Federation, Montana Water Development Association, Women Involved in Farm Economics, and the Agricultural Preservation Association, supported passage of H.B. 265.

Their position was set forth very clearly in a written statement submitted to the committee and it is set forth here:

While the suits [Curran and Hildreth] were pending on appeal to the Supreme Court of Montana, the 1983 Legislature considered a variety of stream access legislation. Those efforts failed in deference to the appellate process. In May and June of 1984, the Supreme Court of Montana rendered two broad, sweeping decisions which allowed the public the right to use all state waters for any recreational and incidental uses. The use right was extended to the high water mark on all streams regardless of size. The decisions did not attempt to provide definition to many of the terms and rights extended, inviting a legislative response.

Fortunately the 1983 Legislature had created an interim study committee to receive testimony and

propose legislation. The interim committee met both before and after the Supreme Court of Montana decisions and considered primary and collateral issues raised by the decided cases.

The interim committee gave thoughtful deliberation to the issue and developed House Bill 16 which became the catalyst for the remaining legislation being considered by this committee. It is fair to say that absent these actions the later activities of the agricultural community, working in conjunction with recreationalists and the Department of Fish, Wildlife and Parks, would have never occurred.

As the interim committee's action drew to a close, landowner groups met to outline the goals for upcoming legislation and to plan for [the 1985] session. All groups agreed that it was critical to pass legislation this session, both to define areas left unclear by the Supreme Court of Montana's decisions, to allay the fears of landowners and recreationalists, and to avoid conflict as the newly won rights were tested and applied to specific streams other than the streams subject to the litigation.

To pass legislation which would be sustained in the event of a court challenge required an analysis of the limits of the Supreme Court of Montana decisions and a determination to propose legislation within those limitations. Six major goals were identified.. . .

House Bill 265 addresses all of these concerns within the limitations imposed by the decisions of the Supreme Court of Montana. While the result reached in those decisions were not to the liking of most landowners, it is irresponsible to ignore those decisions or to propose legislation which is not cognizant of the opinions of the court. The Supreme Court of Montana, the third branch of state government, construing the Constitution of Montana, has declared rights to exist in the public which protect the continued recreational use of all waters of the state. Absent passage of a constitutional amendment restricting those rights, legislation which failed to abide by those decisions and the Montana Constitution would probably be declared void. There is little gained in passing legislation which is constitutionally flawed and likely to be declared void if challenged. Thus, while landowner grounds appreciated the sincere efforts brought to the debate and drafting of both House Bill 16 and House Bill 275, they concluded alternative legislation was needed which addressed the major goals identified and did so in a vehicle [H.B. 265] which would likely pass court challenge.

16

[Written testimony of Ron Waterman, dated January 22, 1985.]

In my opinion, the District Court correctly concluded that the very point decided in <u>Curran</u> and <u>Hildreth</u> is the issue in this case and that § 23-2-302, MCA was the legislation that constitutionally responded to these opinions and it was left with nothing to do but grant defendant's motion for summary judgment.

_William E. Hewitt_
Justice

Mr. Justice John C. Sheehy, dissenting:

I concur in the dissent of Mr. Justice William E. Hunt, Sr., and have further remarks to make.

The best that can be said of the majority opinion is that as to the recreational use of waters, it has certainly muddied the waters. When one reads the majority opinion in the light of Curran (1984), 682 P.2d 163, 41 St.Rep. 906, and Hildreth (1984), 684 P.2d 1088, 41 St.Rep. 1192, one can only conclude that the law respecting the correlative rights of landowners and recreational water users in Montana is adrift in a sea of confusion.

I. THE STATUTES ON THE RECREATIONAL USE OF STREAMS

Following our decisions in Curran and Hildreth, the legislature met in 1985. One of the principal subjects attacked by the legislature in 1985 was the enactment of laws that would define the rights of recreational water users with respect to adjoining landowners. The legislation was vigorously argued, and the resulting statutes incorporated in Title 23, Chapter 2, Part 3 represent a legislative enactment that balanced the contending arguments of the interested parties. The legislation shows that it was founded on a proper interpretation of Curran and Hildreth, in a field where the interpretation by the legislature was proper. This Court has no business interfering or setting legislation aside where the legislature has properly acted within its distinctive sphere.

For ease of discussion, rather than setting out the statutes in haec verba, it is suitable to paraphrase what the legislature has done, and to set out with particularity those portions which the majority have confused.

18

First, the legislation refers to surface waters, and streams. It has no applicability to lakes. "Surface water" was defined for the purpose of recreational use to include a natural water body, its bed and its banks up to the ordinary high water mark. § 23-2-301(12), MCA. By defining "surface water" to include the water itself and its stream bed up to the high water mark, the legislature was following the law as expostulated in Curran and Hildreth, as will be shown later in this dissent.

The legislature also defined "recreational use" to include fishing, hunting, swimming, floating, boating, and "other water related pleasure activities, and related unavoidable or incidental uses." § 23-2-301(10), MCA.

An important part of the legislation is the division by the legislature of surface waters into classes. Class I waters essentially are defined as those waters that are recognized as navigable or have been judicially determined as navigable or are capable of supporting commercial activities. All other surface waters are designated Class II waters. § 23-2-301(2), (3), MCA.

Recreational uses are permitted in § 23-2-302. More specific reference will be made to those hereunder.

II. TITLE TO STREAMBEDS

The glaring defect in the majority opinion is that although it purports to support the public trust doctrine enunciated in Curran and Hildreth, it finds the public's right to use those waters to be something in the nature of an easement. Such a concept of ownership or right of use is in derogation of the public trust doctrine because under the doctrine the title to the streambed up to the high water mark resides in the state, and while the state may regulate the

19

public use of streambeds under its ownership, it may not deed away the ownership of the streambeds. As to Class I streambeds, the concept of a mere easement right in the public must fail. The state has title.

In Curran, the majority pointed out that under Schively v. Bowlby (1894), 152 U.S. 1, 48-50, 14 S.Ct. 548, 566, 38 L.Ed.2d 331, the Supreme Court stated:

> The Congress of the United States, in disposing of the public lands, has constantly acted on the theory that those lands, whether in the interior, or on the coast, above high water mark, may be taken up by actual occupants, in order to encourage the settlement of the country; but that the navigable waters and the soils under them, whether within or above the ebb and flow of the tide, shall be and remain public highways; and . . . shall not be granted away during the period of territorial government; . . . shall be held by the United States in trust for the future states, and shall vest in the several states, when organized and admitted into union . . . but shall be held as a whole for the purpose of being ultimately administered and dealt with for the public benefit by the state, after it shall become a completely organized community. (Emphasis added.)

682 P.2d at 167, 41 St.Rep. at 910.

We further pointed out in Curran that under the public trust doctrine as first enunciated in Illinois Central Railroad v. Illinois (1892), 146 U.S. 387, 13 S.Ct. 110, 36 L.Ed. 1018, the United States Supreme Court said:

> . . . The trust devolving upon the state for the public, and which can only be discharged by the management and control of property in which the public has an interest, cannot be relinquished by a transfer of the property. The control of the state for the purposes of the trust can never be lost, except as such parcels as are used in promoting the interests of the public therein, or can be disposed of without any substantial impairment of the public interest in the lands and waters remaining. (Emphasis added.)

682 P.2d at 168, 41 St.Rep. at 911.

The majority opinion has set out the provisions of § 70-16-201, MCA, which purports to provide that the owners of

land abounded by water take ownership to the low water mark. Under the public trust doctrine, such transfer of lands subject to the public trust under navigable streams cannot occur. "The control of the state for the purposes of the trust can never be lost." Illinois Central Railroad, 146 U.S. at 387, 13 S.Ct. at 110, 36 L.Ed. at 1018.

Section 17-16-201, MCA, was enacted in 1895, according to its history, although it probably pre-existed state government. Nevertheless, when defining fishing rights in 1933, the legislature provided in § 87-2-305, MCA:

> Navigable waters subject to fishing rights. Navigable rivers, sloughs, or streams between the lines of ordinary high water thereof of the State of Montana and all rivers, sloughs and streams flowing through any public lands of the state shall hereafter be public waters for the purpose of angling, and any rights of title to such streams of the land between the high water flow lines or within the meander lines of navigable streams shall be subject to the right of any person owning an anglers license of this state who desires to angle therein or along their banks to go upon the same for such purpose.

The definition by the legislature in 1933 of the right to use the streambeds up to the high water mark for the purpose of fishing is an indirect recognition of the legislature that § 70-16-301, MCA, is not worth the paper it is written on insofar as it applies to the streambeds between high water marks on navigable streams.

Plainly, then, we held in Curran and that holding controls here:

> Curran has no right of ownership to the river bed or surface waters because their ownership was held by the federal government prior to statehood in trust for the people. Upon statehood, title was transferred to the state, burdened by this public trust.

682 P.2d at 170, 41 St.Rep. at 914.

21

The retrenchment by the majority members from Curran to a position that the adjoining landowners on a stream owned the streambed subject to an easement is perplexing. Three of the majority members, Justices Morrison, Harrison and Weber signed the Curran opinion without a murmur of discontent. Justice Gulbrandson, in his dissent in Curran did not dispute the public trust doctrine theory of ownership in the state, but argued instead that summary judgment was improper on the test of navigability of the Dearborn River.

In Hildreth, we strongly reaffirmed Curran, saying:

Under the 1972 Constitution, the only possible limitation of use can be the characteristics of the waters themselves. Therefore, no owner of property adjacent to state-owned waters has the right to control the use of those waters as they flow through his property. The public has the right to use the waters and the bed and banks up to the ordinary high water mark. Curran, supra. Further, as we held in Curran, in case of barriers, the public is allowed to portage around such barriers in the least intrusive manner possible, avoiding damage to the adjacent owners property and his rights.

Hildreth, 684 P.2d at 1091, 41 St.Rep. at 1195.

In Hildreth, we determine that the landowner had not been deprived of a property right. We said:

As discussed previously in this opinion and extensively in Curran, supra, ownership of the stream bed is irrelevant to determination of public use of the waters for recreational purposes. Navigability for recreational land use is limited, under the Montana Constitution, only by the capabilities of the waters themselves for such use. Hildreth has never owned and does not now own the waters of the Beaverhead River. Under Montana law, the public has the right to use the Beaverhead and its bed and banks up to the ordinary high water mark, with additional, narrowly limited rights to portage around barriers.

684 P.2d at 1094, 41 St.Rep. at 1198.

In Hildreth, Justices Morrison and Weber concurred. Justices Gulbrandson and Harrison dissented, partly on the ground that they would defer to the legislature in finding

22

solutions to water use conflicts between landowners and recreational users. The legislature has now acted.

In the fairly recent case, Montana v. United States (1981), 450 U.S. 544, 101 S.Ct. 1245, 67 L.Ed.2d 493, reaffirmed the proposition that states when organized, own the title to the riverbeds of navigable streams. The court said:

> The Crow Treaties in this case, like the Chippewa treaties in Holt State Bank, fail to overcome the established presumption that the beds of navigable rivers remain in trust for future states and pass to the new states when they assume sovereignty.

450 U.S. at 553, 101 S.Ct. at 1252, 67 L.Ed. at 502.

The statement of the majority opinion therefore, that, "we reaffirm well-established constitutional principals protecting property interests from confiscation" is ill-founded insofar as it applies to Class I streambeds. The adjoining property owners have no ownership interest in the streambeds of Class I waters and therefore, nothing is being confiscated. The major premise of the majority opinion is faulty. When the state legislature acts within its sphere to regulate the use of property which the state owns, we should respect the legislative discretion.

III.   BIG GAME HUNTING

The majority hold unconstitutional this portion of § 23-2-302(2), MCA:

> The right of the public to make recreational use of surface waters does not include, without permission or contractual arrangement with the legislature with the landowner:
>
> . . .
>
> (d)   Big game hunting except by long bow or shotgun when specifically authorized by the commission;
> . . .

23

It has always been accepted that landowners may give permission to big game hunters to go on the landowners' premises for big game hunting. The legislature in the above statute extended this requirement of permission from the landowner to the streambeds which the landowners do not own. If the requirement for the landowners' permission were being attacked by a water recreational user we might have reason to declare that portion of the statute unconstitutional except for the fact the Department of Fish, Wildlife and Parks in any event has the right to control big game hunting. The statute confers no right to big game hunting or streambeds except by permission of the landlord. There is no unconstitutionality inherent in the provision.

IV. OVERNIGHT CAMPING AND DUCK BLINDS

What is said foregoing about the right of the state to control streambeds, particularly under Class I lands, would indicate that the legislature has a perfect right as owner to permit any sort of lawful activity on the portions of the lands that it owns. The majority finds that permitting a water recreational user to roll out his sleeping bag or set up his pup tent overnight is "overbroad." Yet, these are legislative decisions, made by the legislature after public hearings and discussion. What was done was the legislature's business and not ours.

V. THE RIGHT OF PORTAGE

The legislature provided for portage, at the same time as it defined recreational uses, by enacting § 23-2-311, MCA. Paraphrasing that statute, the recreational user of surface waters is empowered to portage around barriers in the least intrusive manner possible, avoiding damage to the landowner's land. The landowner is permitted to create barriers across

24

streams for land or water management or to establish boundary fences. No right of portage is granted if the barrier does not interfere with the public's use of the surface waters. Either a recreational user or a landowner may request a portage route around or over a barrier to avoid damage to a landowner's land. If an artificial barrier is placed by the landowner, the cost of establishing a portage route is borne by the landowner. If the barrier is not of the landowner's doing, the Department of Fish, Wildlife and Parks pays the cost of the portage route. Once established, the Department must maintain the portage route. An arbitration panel is provided for in case the landowner or recreationalist disagree. The portage route is the exclusive means to portage over and around the barrier. No attempt was made by the legislature to establish portage routes for natural routes, as distinguished from artificial barriers.

Again, without distinguishing Class I waters, and without substantial discussion of the difference between Class I and Class II waters, the majority finds the provisions of § 23-2-311, MCA, unconstitutional, insofar as the landowner must bear the cost of constructing a portage route.

The effect of this portion of the majority opinion is to give the landowner the go-ahead to construct artificial barriers across navigable waters which impede recreational use without cost. What we have said foregoing with respect to title serves to refute any possible logic in that position.

VI. CONCLUSION

I would uphold the constitutionality of the statutes in toto. The legislature, cognizant of its ownership rights and

25

its duties as trustee of the public acted within its legislative discretion in adopting the statutes. There is no sound basis for our interference.

_John C. Sheehy_
Justice