2004 SD 27

Ordean PARKS, Austin Schiley, Patricia Schiley, Raymond L. Parks, Irl William Schiley, Harlo House, Inc. (whose principal owner is Harold Widvey), Charles Saylor, the Estate of Constance Saylor, Lorraine Stamps, Reuben Parks, and Vernon L. Parks Trust, Reuben Parks, Orion Parks, Otto Deuschle, Vernon L. Parks Trust, Orville Christopherson, Joe Matthews, Michael Matthews, Robert Dale, Greg Pesall, Randy Knutson, Mike Dale, Jerome Dale, Mike Egeland, John Amann, and Orlyn Evenson, Plaintiffs and Appellees,

v.

John COOPER, as Secretary of State of the South Dakota Game, Fish and Parks Department, Colby Hunsley, Chad Strand, Richard Waba, Lyle Johnson, and a class of individuals, similarly situated, who have or intend to use the bodies of water described in this Complaint without the permission of the owners of the property over which the waters lie, Defendants and Appellants.

No. 22601.

Supreme Court of South Dakota.

Argued March 25, 2003.

Decided Feb. 25, 2004.

Jack Hieb of Richardson, Grosclose, Wyly, Wise & Sauck, Aberdeen, South Dakota, Attorneys for plaintiffs and appellees.

Lawrence E. Long, Attorney General, Diane Best and Charles D. McGuigan, Assistant Attorneys General, Pierre, South Dakota, Attorneys for defendants and appellants.

KONENKAMP, Justice.

[¶ 1.] The dispute in this appeal centers on three bodies of water located in Day and Clark counties in South Dakota, known as Long Lake, Parks Slough, and Schiley Slough. Because of unseasonably

wet years, the water has accumulated into large lakes. They have attracted the interest of the public looking for sporting and recreational opportunities. Landowners with property interests in one or more of these three areas sought a declaratory judgment on their property rights and an injunction against the State and the public from using these lakes. In deciding in favor of the landowners, the circuit court held both the land and the water to be private property and enjoined public access. On appeal, the State raises multiple legal issues for our consideration, but ultimately, we conclude that all water in South Dakota belongs to the people in accord with the public trust doctrine and as declared by statute and precedent, and thus, although the lake beds are mostly privately owned, the water in the lakes is public and may be converted to public use, developed for public benefit, and appropriated, in accord with legislative direction and state regulation. Thus, we reverse and remand.

## I.

[¶ 2.] Over the past several years, rainfall and snowmelt have flooded and enlarged all three areas into large bodies of water. On appeal, the question is whether the lakebeds of Long Lake, Parks Slough, and Schiley Slough and the water on the lakebeds can be declared separate properties, the land, private, and the water, public. All three areas in dispute were originally surveyed under the auspices of the federal government in the 1870s. The surveyors, commissioned by the United States Surveyor General's Office, were issued instructions on how to survey water bodies. The 1868 instructions, effective at the time the areas in dispute were surveyed, provided that if a body of water was: (a) 40 acres or less; or (b) shallow or likely in time to dry up or be greatly reduced by evaporation, drainage, or other causes, the surveyors should not draw meander lines around that body of water but should simply include the water body and its bed in their survey as part of the lands available for settlement.

[¶ 3.] In the trial of this case, Warren Fisk, a land surveyor and civil engineer, testified after reviewing the relevant survey notes.[1] He opined that the original surveys were properly conducted.[2] Furthermore, Fisk ascertained that the notes and maps from the surveys do not indicate the existence of any large bodies of water in these areas at the time of the surveys. Thus, not one of the bodies of water at issue in this case was meandered by the surveys. In fact, all of the land was made available for settlement with the exception of two sections of land that were patented to the State of South Dakota for use as School and Public Lands.

[¶ 4.] Over the years, the two School and Public Lands sections were sold to private individuals, except for an eighty acre parcel on Long Lake that was purchased by the South Dakota Department

1. Fisk is a graduate of the South Dakota School of Mines and Technology and has been a professional engineer and land surveyor licensed by the State of South Dakota since 1970. He is knowledgeable in the field of surveying and has a thorough knowledge regarding how the surveys of these lands were conducted. In addition, Fisk has extensive experience in land surveying in general and in reading survey notes prepared by the surveyors under contract with the Surveyor General of the United States. Fisk is familiar with the methods used by the survey crews that conducted the surveys of the Dakota Territory.

2. His opinion is buttressed by the fact that some of the parcels of land surveyed by these same surveyors were resurveyed in 1918 and all the original monuments placed and set by the surveyors were found in the resurvey.

of Game, Fish and Parks (GF & P) at a public auction in 1963. The State also claims title to an abandoned rail bed running through Schiley Slough.

[¶ 5.] During the past 125 years, depending on weather patterns, these areas were either dry or marshy or covered with water at varying depths. Only recently has the land been continuously covered with deep water. For more than seventy years, the areas at issue have been consistently used to pasture cattle and raise crops. Many of the areas now several feet under water had large mature trees growing on them. In their current state, these bodies of water are capable of being used for fishing, hunting, trapping, and other recreational purposes.

**Long Lake**

[¶ 6.] The area known as Long Lake is located two miles east of Lily, South Dakota.[3] Directly north of Long Lake is a meandered body of water known as Horseshoe Lake. Due to the flooding of the 1990s, the water covering the land in Long Lake pushed so far north that it ran over the county road and into Horseshoe Lake. Currently, the two bodies of water are now connected by a culvert under the county road. The combined lakes have 2686 surface acres of water and a depth of fifteen feet.

[¶ 7.] From the time of settlement in the late 1800s and early 1900s, the Long Lake land could best be characterized as pasture and farmland, dotted by small sloughs holding seasonal moisture. Before the recent flooding, and within recorded history, the deepest water that covered any part of this area was approximately four to five feet in depth.[4] Typically, this water was located in the small sloughs on the property. The land currently covered by water in the Long Lake area was consistently used by its owners for farming, grazing, and haying, depending on the amount of moisture.

[¶ 8.] Historically, the Long Lake area has been suitable for trapping furbearing mammals, such as muskrat and mink, and some trapping has occurred there. In 1917 and the 1940s, waterfowl were hunted in the Long Lake area. Recently, Long Lake has been used by members of the public who have gained access from public rights of way for fishing, ice fishing, and snowmobiling.

[¶ 9.] The State's geomorphology expert, Dr. Jim Richardson, studied soil surveys, topographic mapping, aerial photography, and climatic data. He also conducted a field visit. At trial, Dr. Richardson interpreted the aerial photographic evidence.[5] It revealed that in 1939 there was no standing water in the area; however, the soil in parts of the area remained moist even in the late summer following a lengthy drought. Similarly, in 1979, a "normal" year for precipitation in that area, the aerial photographs showed that there was no standing water, other

---

3. Thirteen appellees are riparian or littoral landowners on Long Lake. *See* Black's Law Dictionary (6th ed 1990): "Littoral land. Land bordering ocean, sea, or lake." "Riparian land. Land so situated with respect to a body of water that, because of such location, the possessor of the land is entitled to the benefits incident to the use of the water."

4. Before 1997 or 1998, it would have been impossible for fish to survive in any body of water covering any part of the Long Lake area because none of the water was ever deep enough for fish to survive the winter and all of the water would often dry up completely.

5. Dr. Richardson used the Stuart and Kantrude system for classifying these areas as semi-permanent or permanent wetlands. Under that test, water needs to be "at or near the surface of the ground" in order to classify an area as semi-permanent or permanent wetland. Therefore, moist soil indicates "a wetland."

than the water in the dugouts constructed during the 1950s and 1960s to water livestock. Finally, the photographic evidence from 1991, another "normal" year for precipitation, illustrates that there was only one small area of standing water and it was less than waist deep.

[¶ 10.] Dr. Richardson further opined that strong wave action had previously occurred around Long and Horseshoe Lakes and formed a continuous beach or strandline around the combined water bodies. He noted that these strandlines existed well before the 1939 aerial photograph as numerous strandlines were visible in that photo. In fact, Dr. Richardson estimated that the largest strandlines were created approximately eight or nine thousand years ago. The State argues that the strandline is in approximately the same place as the perimeter of the lake in 1998. On the other hand, the landowners note that Dr. Richardson agreed that there has never been as much water covering the Long Lake area as there is now. All the evidence shows that Long Lake has never been as large as it was in the late 1990s and early 2000s.

**Parks Slough**

[¶ 11.] Until the late 1990s, the area known as Parks Slough was a series of small, unconnected hay sloughs. A "hay slough" or "hay marsh" is an area that normally floods with shallow water for a period of time during the spring. This temporary flooding allows for the growth of vegetation used for hay to feed cattle. In dry years, these "hay sloughs" can be the only sources of hay for cattle. The largest of the sloughs in the Parks Slough area was normally about sixty-six acres and the smallest was about fifteen acres. At the time of the trial, the area was covered by approximately 245 surface acres of water, with a maximum depth of thirty feet.

[¶ 12.] In 1923, Day County constructed Highway 25 around the Parks Slough area.[6] Since the 1930s, the Parks Slough area has been farmed, hayed, and grazed. In the 1950s and 1970s, the land was so dry that dugouts were constructed to water livestock. Currently, these dugouts are several feet under water. During the 1980s, much of the area qualified for enrollment in the Conservation Reserve Program. At that time, enrollment required that the land be used for crops for at least three of the previous five years between 1980 and 1985. The Parks Slough area met these criteria.

[¶ 13.] This area has supported wildlife. During the 1950s, 1960s, and 1970s, ducks were hunted there. In the early 1940s, early 1960s, and the mid–1970s, the Parks Slough area was used for trapping. In the mid–1990s, Ordean Parks introduced perch into this water body.

[¶ 14.] Recently, Parks Slough has been a very productive walleye-rearing pond, producing a significant population of fingerlings. The Parks family has been cooperative with the State in its use of the water body to raise fish. Although closure of the water body was necessary to manage fisheries, a dispute arose between the Parks family, who expected that the public would be kept from using the water body, and the GF & P concerning whether Parks Slough was public or private.

[¶ 15.] When the area flooded and the water abutted adjacent rights of way, members of the public began launching boats off the roads and onto the waters of Parks Slough. In addition, people would

---

6. The road was continuously maintained with this curve. A 1909 county atlas showed this water body in Butler township.

access the water via the road during the winter for ice fishing purposes. When the landowners sought assistance from the State, neither the GF & P nor the Day County authorities would prosecute the alleged trespassers believing that the water body was public.

[¶ 16.] In 1999, the State needed walleye eggs for their spawning operations. Ordean and Orion Parks and Otto Deuschle agreed with the State that the water body should be administratively closed under SDCL 41–2–18. The agreement provided that the landowners would allow the State to use the area to collect walleye spawn in return for closing Parks Slough from the public.

### Schiley Slough

[¶ 17.] The area known as Schiley Slough is located directly north of Lily, South Dakota.[7] In 1876, the United States Surveyor General sketched this area as a "drain," although part of it is referred to as a "hay marsh" in the survey notes. In 1889, a railroad line was built in this area.[8] In the early 1900s, the area was reputedly used for harvesting ice. Historically, this area has been grassland used for pasture and hay, although parts of the area have been farmed. In the 1950s and 1960s the water at Schiley Slough was used for waterfowl hunting and trapping.

[¶ 18.] In recorded history, Schiley Slough was never a solid body of water until the late 1990s. In dry times, it was grassland; in pluvial times, it was wetland. The aerial photographic evidence revealed that in 1939 there were only two very small bodies of open water on the property and that each was waist deep or less. In 1958, no standing water was visible on the property. Between the late 1950s and 1970s, four dugouts were constructed to water livestock. In 1991, there were three small bodies of standing water, all less than waist deep. By 1997, Schiley Slough had grown to 625 surface acres and is now perhaps as much as thirteen feet deep in places.

[¶ 19.] The trial court concluded that the three bodies of water were not "meandered," i.e. not plotted out as lakes, when the federal government surveyed the land before statehood, thus the waters were not "navigable" and the State did not receive title to the beds in question under the equal footing doctrine. Further, the court reasoned that in South Dakota some bodies of water may be deemed "navigable" under the State legal test for navigability, but still remain private. Ultimately, the trial court declared Long Lake, Parks Slough, and Schiley Slough to be private bodies of water and enjoined the State from providing public access to them. Of course, South Dakota was free to open any state owned land to the public if it was adequately marked so that the existing property boundaries under the water could be determined with specificity. On appeal, the State raises the following issues: (1) Whether the public trust doctrine recognizes water as a unique natural resource held in trust by the public for use by the public. (2) Whether the recreational use of water bodies controls public access. (3) Whether the federal "navigability for title" test is applicable to this case.

## II.

[¶ 20.] We review declaratory judgments as any other order or judg-

---

7. Eight of the appellees own land around Schiley Slough. Schiley Slough is "of the same general character and lies in proximity to Long Lake and Parks Slough."

8. The Chicago, Milwaukee & St. Paul Railroad's 1889 plat shows a lake bed in the Northwest Quarter of Section 9, a drain from east to west through the middle of Section 16, and a lake bed in the Northeast Quarter of Section 21.

ment. SDCL 21–24–13; *Auto–Owners Ins. Co. v. Hansen Housing, Inc.*, 2000 SD 13, ¶ 9, 604 N.W.2d 504, 508–09 (citations omitted). A trial court's findings of fact are examined under the clearly erroneous standard. SDCL 15–6–52(a); *Muhlenkort v. Union County Land Trust*, 530 N.W.2d 658, 660 (S.D.1995). These findings remain inviolate unless we are "firmly and definitely convinced a mistake has been made." *Wood v. South Dakota Cement Plant*, 1999 SD 8, ¶ 9, 588 N.W.2d 227, 229 (citation omitted). The circuit court's conclusions of law are reviewed under the de novo standard. *Carstensen Contracting, Inc. v. Mid–Dakota Rural Water System, Inc.*, 2002 SD 136, ¶ 8, 653 N.W.2d 875, 877, n2. Additionally, the burden of proving navigability and asserting the public trust lies with the party asserting it. *State v. McIlroy*, 268 Ark. 227, 595 S.W.2d 659, 666 (1980) (Fogleman, C.J., concurring in part and dissenting in part) (citations omitted). Here, the State has that burden.

### III.

[¶ 21.] The State argues that the circuit court erred in ruling that when lake beds are private, the waters above those beds are also private. Instead, the State advocates that water is a separate asset held by the State in trust for the public. The landowners argue that South Dakota case law has only extended the public trust doctrine to water overlying a bed that passed to the State under the equal footing doctrine and the federal navigability for title test, and thus, because the State did not hold title to the beds in question at

statehood, the water is private and the public should not have a right to use it.

[¶ 22.] Never in South Dakota has determining the navigability of a water body been a matter of deciding if the water itself is public or private. Historically, water rights in this context have depended on navigability. Under the equal footing doctrine, at the time of statehood each state took title to the beds underlying its navigable waters.[9] Once the beds of the navigable waters are in state ownership, they are held subject to a public trust and cannot be conveyed unless it would promote a public purpose. The public trust doctrine was first defined in *Illinois Cent. R.R. Co. v. Illinois*, 146 U.S. 387, 13 S.Ct. 110, 36 L.Ed. 1018 (1892). In that case, the Illinois legislature granted a railroad title to part of the bed of Lake Michigan in return for the railroad's promise to pay the state a percentage of its gross earnings from wharfs, piers, and docks to be built over the bed. *Id.* The Legislature later repealed the act, and the railroad claimed that the repeal was invalid. *Id.* The state filed suit for a judicial determination of title to the submerged lands. *Id.* On appeal, the United States Supreme Court upheld the repeal and found the original grant of title to be invalid. *Id.* The Court reasoned that the state held title to the lands beneath the navigable waters of Lake Michigan in trust for its citizens and could not convey the lands inconsistent with that trust. *Id.*

### A. Applicable Navigability Test

 [¶ 23.] Since the decision in *Illinois Central Railroad*, it is commonly ac-

9. The theory of state sovereign ownership of submerged lands and tidelands was articulated by the Supreme Court in 1842 in *Martin v. Waddell's Lessee*, 41 U.S. (16 Pet) 367, 10 L.Ed. 997 (1842). Three years later, in *Pollard v. Hagan*, 44 U.S. (3 How) 212, 11 L.Ed. 565 (1845), the Court held that the theory applies to all states, not just those formed from the thirteen original colonies. In essence, the "equal-footing" doctrine, as set forth in *Pollard*, holds that the federal government retained title to navigable waters so that all states entering the Union after the original thirteen would enter on an "equal footing." *Id.*

cepted that states hold navigable waters, as well as lands beneath them, in trust for the public. Here, we must first determine which navigability test applies—the federal navigability for title test or the state navigability test. Under the federal test, the question is whether the water body was "navigable in fact" at the time the state entered the Union.[10] Thus, the waterway must have been susceptible to being used as an "avenue of commerce" in its ordinary condition at the time of statehood. *Utah v. United States*, 403 U.S. 9, 91 S.Ct. 1775, 29 L.Ed.2d 279 (1971); *Hughes v. Washington*, 389 U.S. 290, 88 S.Ct. 438, 19 L.Ed.2d 530 (1967); *The Daniel Ball*, 77 U.S. (10 Wall) 557, 19 L.Ed. 999. Our

state navigability test originated in *Hillebrand v. Knapp*, 65 S.D. 414, 274 N.W. 821 (1937). There, the plaintiff sought to enjoin the defendant from cutting hay from a lake bed in front of the plaintiff's property. *Id.* at 822. This Court ruled that ownership of the bed was in the state. *Id.* at 822–23. The lake had at no time been used for commerce and was not susceptible to commerce. *Id.*

■ [¶ 24.] Relying on *Lamprey v. Metcalf*, 52 Minn. 181, 53 N.W. 1139 (1893), this Court assumed that it had the jurisdiction to design its own test of navigability for title and applied the "pleasure boat" test to find the lake navigable.[11]

10. The federal test of navigability provides:

> Those rivers must be regarded as public navigable rivers in law which are navigable in fact. And they are navigable in fact when they are used, or are susceptible of being used, in their ordinary condition, as highways for commerce, over which trade and travel are or may be conducted in the customary modes of trade and travel on water.

*The Daniel Ball*, 77 U.S. (10 Wall) 557, 563, 19 L.Ed. 999, 1001 (1870). Further, the United States Supreme Court has held:

The rule long since approved by this court in applying the constitution and laws of the United States is that streams or lakes which are navigable in fact must be regarded as navigable in law; that they are navigable in fact when they are used, or are susceptible of being used, in their natural and ordinary condition, as highways for commerce, over which trade and travel are or may be conducted in the customary modes of trade and travel on water; and further that navigability does not depend on the particular mode in which such use is or may be had— whether by steamboats, sailing vessels or flatboats—nor on an absence of occasional difficulties in navigation, but on the fact, if it be a fact, that the stream in its natural and ordinary condition affords a channel for useful commerce.

*United States v. Holt State Bank*, 270 U.S. 49, 56, 46 S.Ct. 197, 199, 70 L.Ed. 465 (1926).

11. *Hillebrand* is cited most often as South Dakota's adoption of the "pleasure boat" test. In adopting the "pleasure boat" test, this Court said

[T]he term "navigable" has been extended and includes waters that are not navigable in the ordinary sense. In *Flisrand v. Madson*, 35 S.D. 457, 152 N.W. 796, 798, it was held, after a consideration of the statutory provisions quoted and a review of many of the leading cases, that whether or not waters are navigable depends upon the natural availability of waters for public purposes taking into consideration the natural character and surroundings of a lake or stream. This division of lakes and streams into navigable and nonnavigable is the equivalent to a classification of public and private waters. Thus in *Lamprey v. State (Metcalf)*, 52 Minn. 181, 53 N.W. 1139, 1143, 18 LRA 670, 38 AmStRep 541, the court said: "Many, if not the most, of the meandered lakes of this state, are not adapted to, and probably will never be used to any great extent for, commercial navigation; but they are used—and as population increases, and towns and cities are built up in their vicinity, will be still more used—by the people for sailing, rowing, fishing, fowling, bathing, skating, taking water for domestic, agricultural, and even city purposes, cutting ice, and other public purposes which cannot now be enumerated or even anticipated. To hand over all these lakes to private ownership, under any old or narrow test of navigability, would be a great wrong upon the public for

Several other states in the years after *Lamprey* agreed that navigability for title was to be a state law test, often discarding the notion that the water must be capable of commercial purposes in favor of tests where the water was found naturally suitable for a broad range of public uses. However, the United States Supreme Court has made clear that the navigability for title test is one of federal law. *United States v. Utah*, 283 U.S. 64, 75, 51 S.Ct. 438, 440–41, 75 L.E.d 844, 849 (1931) (The question of navigability is a federal question and state laws cannot affect titles vested in the United States.); *Holt State Bank*, 270 U.S. at 55–56, 46 S.Ct. at 199, 70 L.Ed. at 469 (Navigability is a question of federal law to be determined according to whether the stream or lake is navigable in fact.); *Brewer–Elliott Oil & Gas Co. v. United States*, 260 U.S. 77, 88, 43 S.Ct. 60, 64, 67 L.Ed. 140, 146 (1922) ("It is not for a state by courts or legislature, in dealing with the general subject of beds of streams to adopt a retroactive rule for determining navigability which would destroy a title already accrued under federal law and grant or would enlarge what actually passed to the state, at the time of her admission, under the constitutional rule of equality here invoked."). Thus, our *Hillebrand* state test for navigability is inapplicable to lake beds originating from federal patents.

[¶ 25.] Applying the federal navigability for title test to the lakebeds here, we conclude that the title to these beds lies with the landowners. A review of the record reveals no evidence tending to establish navigability in fact or a use of the water for commercial purposes at the time of statehood. In fact, the survey records reveal that there was little, if any, water on these lands at the time the land was surveyed. Therefore, the circuit court properly applied the federal test of navigability, finding that the beds were owned by those holding the federal patent to the property. But we are still left with the question of water ownership as a separate asset.

## B. Water Law in Dakota Territory, North, and South Dakota

[¶ 26.] The original owners of the land in question here obtained their titles by patent. These patents are dated as early as 1888.[12] In 1877, however, Congress passed the Desert Land Act. *See* 19 Stat 377, ch 107; 43 USC §§ 321–323. The Act applied to Dakota Territory and still applies to North and South Dakota and twelve other western states. 43 USC § 323. Under this act, Congress

> severed the land and waters constituting the public domain and established the rule that for the future the lands should

all time, the extent of which cannot, perhaps, be now even anticipated."

It was decided by this [C]ourt in the case of *Olson v. Huntamer*, 6 S.D. 364, 61 N.W. 479, that where a meandered lake is nonnavigable the patentee of land bordering thereon takes title to the middle of the lake, proportionately with other riparian owners. As to navigable lakes and streams, the state holds title below ordinary low-water mark and the land between such boundary and the ordinary high-water mark is subject to certain public uses which we need not consider. The state holds title to the bed of such lake or stream not in a proprietary capacity, but in trust for the peo-

ple that they may enjoy the use of navigable waters for fishing, boating, and other public purposes freed of interference of private parties. *Flisrand v. Madson, supra; Anderson v. Ray*, 37 S.D. 17, 156 N.W. 591; *State ex rel. Clark v. Deisch*, 38 S.D. 560, 162 N.W. 365; *Karterud v. Karterud*, 47 S.D. 58, 195 N.W. 972. The question of title to beds of lakes is the subject of an annotation in 23 A.L.R. 757. *Hillebrand*, 274 N.W. at 822–23.

12. Federal patents were issued from the years 1888 to 1923. South Dakota patents were issued from 1942 to 1989.

be patented separately. Acquisition of the government title to a parcel of land was not to carry with it a water right; but all non-navigable waters were reserved for the use of the public under the laws of the various arid-land states.

*Ickes v. Fox,* 300 U.S. 82, 94–96, 57 S.Ct. 412, 81 L.Ed. 525, (1937) (citing *California Oregon Power Co. v. Beaver Cement Co.,* 295 U.S. 142, 162, 55 S.Ct. 725, 79 L.Ed. 1356 (1935)). In *California Oregon Power,* the Court explained the implication of the Desert Land Act:

What we hold is that, following the act of 1877, if not before, all non-navigable waters then a part of the public domain became publici juris, subject to the plenary control of the designated states, including those since created out of the territories named, with the right in each to determine for itself to what extent the rule of appropriation or the common law rule in respect of riparian rights should obtain.

*Id.* at 163–164. In sum, the Desert Land Act limited the water rights of settlers to what they had actually appropriated and used, and freed all surplus water for public appropriation. *State Water Resources Control Board v. United States,* 44 Cal.3d 448, 243 Cal.Rptr. 887, 749 P.2d 324, 332 (1988) (citation omitted).[13]

[¶ 27.] As early as 1866, in the Civil Code of Dakota Territory, § 256, the law provided:

The *owner of the land owns water standing thereon,* or flowing over or under its surface, but not forming a defi-

nite stream. Water running in a definite stream, formed by nature over or under the surface, may be used by him as long as it remains there; but he may not prevent the natural flow of the stream, or of the natural spring from which it commences its definite course, nor pursue nor pollute the same.

(Emphasis added.) This section was taken verbatim from the New York Civil Code as proposed by the New York Code Commission, and was intended as a concise statement on the extant common law of riparian rights. *See Redwater Land & Canal Co. v. Reed,* 26 S.D. 466, 128 N.W. 702, 707 (S.D.1910). Over the years, this provision was carried over without substantive change in the territorial codes and, after statehood, in the South Dakota codes. *See* Dakota Rev. Civil Code of 1877, § 255; Dakota Comp. Laws of 1887, § 2771; S.D. Rev.Code 1919, § 348.[14]

[¶ 28.] In contrast to the statutory right of ownership of standing water on private land, South Dakota never recognized in its riparian doctrine or in its appropriation doctrine an unqualified right to own and control water. Statutory laws declining to recognize such expansive private rights were first adopted in territorial times. The first pronouncement on this subject came from the action of Legislative Assembly of the Territory of Dakota in 1881. At that time, an unqualified and absolute right of control by riparian owners was rejected. Instead, the Legislative Assembly only permitted riparian ownership for consumptive uses, i.e. title "to the

13. However, the patents do not exclude or reserve the beds or channels of watercourses. *Day v. Armstrong,* 362 P.2d 137, 150 (Wyo. 1961).

14. North Dakota also carried this provision over into its code. However, North Dakota also included in its Constitution the following provision: "All flowing streams and natural

water courses shall forever remain the property of the state for mining, irrigating and manufacturing purposes." N.D. Const. Article XVII, § 210. The South Dakota Constitution contains no specific provision on the dedication or control of either surface or underground waters.

usual enjoyment of the waters of the streams or creeks in said Territory for *mining, milling, agricultural or domestic purposes....* " 1881 Territory of Dakota General Laws ch 142 § 1 (emphasis added).

[¶ 29.] In 1905, the Legislature adopted the appropriation doctrine and an irrigation code. In that act, the Legislature declared that *"[a]ll waters within the limits of the state from all sources* of water supply not navigable, *belong to the public* and are subject to appropriation for beneficial use." 1905 SD Laws Ch 132 § 1 (emphasis added). This declaration of the public trust was repeated and extended in 1907. *"All the waters within the limits of the state from all sources* of water supply *belong to the public* and, except as to navigable waters, are subject to appropriation for beneficial use." 1907 SD Laws Ch 180 § 1 (emphasis added).

[¶ 30.] This Court's precedent also recognized that a riparian owner's right to water was qualified. For example, on the first occasion this Court was required to determine the extent of a riparian owner's rights for purposes of a claimed taking, this Court explicitly noted that a riparian owner's water right was qualified by public rights. In declaring the scope of a riparian owners rights, the Court explicitly noted the public trust by stating "[e]very person, through whose land a natural watercourse runs, has a right, *publica juris*[15], to the benefit of it for all useful purposes to which it may be applied," and also that, "[i]n a certain limited sense[,] water flowing in a natural stream *belongs to the public,* but the right to the use thereof is the subject of private property and ownership by riparian owners or others...." *St.*

*Germain Irrigating Co. v. Hawthorn Ditch Co.,* 32 S.D. 260, 143 N.W. 124, 126–27 (1913) (emphasis added) (citations omitted).

[¶ 31.] In the meantime, the provision containing the rule that the "owner of the land owns water standing thereon" was finally revised for clarity and included in the South Dakota Code of 1939, § 61.0101. By 1955 this provision, through a series of amendments, had been modified to state in SDC 61.0101 as follows:

Ownership and right of use. Subject to vested private rights, and except as hereinafter in this section specifically provided, all the waters within the limits of this state, from whatever source of supply, belong to the public and, except navigable waters, are subject to appropriation for beneficial use. Subject to the provisions of this Code relating to artesian wells and water, the *owner of the land owns water standing thereon,* or flowing over or under its surface, but not forming a definite stream....

(Emphasis added.) In that same year, however, Chapter 430, Laws of 1955 expressly repealed SDC 61.0101 and substituted the following provisions:

61.0101 General state policy. It is hereby declared:

(1) That because of conditions prevailing in this state the general welfare requires that the water resources of the state be put to beneficial use to the fullest extent of which they are capable, and that the waste or unreasonable method of use of water be prevented, and that the conservation of such water is to be exercised with a view to the reasonable and beneficial use thereof in the interest of the peo-

---

**15.** According to LATIN WORDS AND PHRASES FOR LAWYERS, (R.S. Vasan ed., 1980), publica juris means a public right: "A right that is exercisable by all persons of the community. When the thing is common property so that anyone can make use of it, it is said to be *publici juris,* as in the case of light, air, and public water."

ple and for the public welfare. The right to water or to the use or flow of water in or from any natural stream or watercourse in this state is and shall be limited to such water as shall be reasonably required for the beneficial use to be served, and such right does not and shall not extend to the waste or unreasonable use or unreasonable method of diversion of water; (2) That all water within the state is the property of the people of the state, but the right to the use of water may be acquired by appropriation in the manner provided by law; (3) That the people of the state have a paramount interest in the use of all the water of the state and that the state shall determine what water of the state, surface and underground, can be converted to public use or controlled for public protection; (4) That the protection of the public interest in the development of the water resources of the state is of vital concern to the people of the state and that the state shall determine in what way the water of the state, both surface and underground, should be developed for the greatest public benefit; (5) That it is the established policy of this state: (a) That the use of water for domestic purposes is the highest use of water, and takes precedence over all appropriative rights; . . .

\* \* \*

[¶ 32.] Gone from our code was the pre–1955 statutory dictum inherited from territorial times that "the owner of the land owns water standing thereon[.]" Instead, there remained the sweeping provisions that all waters, "surface and underground, can be converted to public use or controlled for public protection," and "all water within the state is the property of the people of the state[.]"

[¶ 33.] When a landowner attacked this enactment as unconstitutional, the Court in *Knight v. Grimes*, 80 S.D. 517, 127 N.W.2d 708 (S.D.1964), put the question as "whether the [L]egislature may, without compensation, abolish the rule of (so-called) absolute ownership of unappropriated percolating waters and substitute the doctrine of appropriation for beneficial use under state supervision?" *Id.* at 711. The Court declared the statute valid because it recognized and afforded protection to the vested rights the landowner had initiated and acquired before the passage of the statute. Later, in *Belle Fourche Irrigation Dist. v. Smiley*, 84 S.D. 701, 176 N.W.2d 239 (1970), this Court declared that the *Knight* case, concerning underground waters, was equally applicable to surface waters. *Id.* at 245–46 (citing *Williams v. City of Wichita*, 190 Kan. 317, 374 P.2d 578 (1962); *Baeth v. Hoisveen*, 157 N.W.2d 728 (N.D.1968); Hutchins, Riparian–Appropriation Conflicts in the Upper Midwest, 38 N Dak L Rev 278 (1962); Munro, South Dakota and the Water Impasse, 11 SD L Rev 255 (1963)).

[¶ 34.] Paralleling South Dakota's experience, North Dakota, with its shared heritage, has had several occasions to examine the question of water rights. The North Dakota Supreme Court recognized in *Baeth*, 157 N.W.2d at 732:

South Dakota's history in regard to water and water rights is very similar to ours. Both States, as a Territory, came under the provisions of the Desert Land Act, and both States derived much of their water law from Section 255 of the Revised Civil Code of 1877. Both States are largely semiarid, and in both States the general welfare requires that water

resources be put, to the fullest extent capable, to beneficial uses.

Thus the Court concluded that a declaration that all waters in the State belong to the public and may be appropriated through proper administrative procedure is a valid exercise of the State's police power, so long as it does not expropriate vested rights. *Baeth,* 157 N.W.2d at 733. Considering our common history, the North Dakota Supreme Court held that there is no absolute ownership of ground water underlying land that has not actually been diverted and applied to a beneficial use. Thus a landowner does not have a "vested right" to unused ground water underlying his land. *Baeth,* 157 N.W.2d at 732 (citing *Knight v. Grimes, supra* ).

[¶ 35.] A North Dakota statute provides that "[w]aters on the surface of the earth excluding diffused surface waters but including surface waters whether flowing in well defined channels or flowing through lakes, ponds, or marshes which constitute integral parts of a stream system, or waters in lakes ... belong to the public." ND Cent Code § 61–01–01. This section, the North Dakota Supreme Court ruled, expresses the public trust doctrine, which "permits alienation and allocation of such precious state [water] resources only after an analysis of the present supply and future need." *United Plainsmen Ass'n v. North Dakota Water Conservation Comm'n,* 247 N.W.2d 457, 462–63 (N.D. 1976). Moreover, the North Dakota Supreme Court recognized that "[t]he ownership of *beds* of streams and lakes is quite a different matter from the right to control waters." *North Dakota State Water Comm'n v. Board of Managers,* 332 N.W.2d 254, 258 (N.D.1983) (quoting *State v. Adams,* 251 Minn. 521, 89 N.W.2d 661, 678 (1957), *cert. denied,* 358 U.S. 826, 79 S.Ct. 45, 3 L.Ed.2d 67 (1958)) (emphasis added).

[¶ 36.] In giving paramount importance to the public trust doctrine, the North Dakota Supreme Court held that the doctrine requires "as a minimum, evidence of some · planning" by the state for future water needs before it grants permits for new water appropriations. ·*United Plainsmen,* 247 N.W.2d at 463. North Dakota's water laws have evolved along the same lines as South Dakota's. Although "not framed to divest the rights of riparian owners in the waters and beds of all natural water courses in the state," these laws are intended to place "the integrity of our water courses beyond the control of individual owners." *State v. Brace,* 76 N.D. 314, 36 N.W.2d 330, 335 (1949) (quoting *Bigelow v. Draper,* 6 N.D. 152, 69 N.W. 570, 573 (1896)).

## C. Water as a Separate Public Trust Asset.

[¶ 37.] The landowners here do not claim a vested interest through prior usage or appropriation of the water in the lakes on their land. Their claim is that because they own the land underlying the lakes, they own the water as well. Yet, notwithstanding private ownership of beds underlying water bodies, a number of state courts have recognized the application of the public trust doctrine to their water resources, holding that where a body of water is suitable for public use according to state law standards, a public right to use that water will be recognized.

[¶ 38.] Citing state constitutional and statutory provisions as support for the principle that all water in the state is owned by the people or by the state for the use of the people, several states have approved the public's right to use water independent of bed ownership. *S. Idaho Fish & Game Ass'n v. Picabo Livestock, Inc.,* 96 Idaho 360, 528 P.2d 1295 (1974) (navigable stream); *Montana Coalition*

*for Stream Access, Inc. v. Hildreth,* 211 Mont. 29, 684 P.2d 1088 (1984) *overruled on other grounds by Gray v. City of Billings,* 213 Mont. 6, 689 P.2d 268, 272 (1984); *Montana Coalition for Stream Access, Inc. v. Curran,* 210 Mont. 38, 682 P.2d 163 (1984); *State ex rel. State Game Comm'n v. Red River Valley Co.,* 51 N.M. 207, 182 P.2d 421 (1945); *Armstrong,* 362 P.2d 137. The State of Wyoming holds title to water in "trust for the benefit of the people" independent of whether the underlying bed is privately owned. *Id.* at 145. Public use hinges on whether the water is capable of being used for public purposes. *Id.* While lawfully floating craft in the state's waters, the public may hunt, fish or do any of those other things not otherwise made unlawful. *Id.* at 147.

[¶ 39.] In Minnesota, the state, as trustee, retains the duty to protect the public's right to enjoy the waters regardless of claims that the underlying lakebed is owned by the riparian owner. *State v. Kuluvar,* 266 Minn. 408, 123 N.W.2d 699, 706–07 (1963) (channel to public lake crossing international boundaries). Relying on a state statute, the Minnesota Supreme Court found that the state "possesses a proprietary interest in the public waters of the state" and that "[r]iparian rights are subordinate to the rights of the public and subject to reasonable control and regulation by the state." *Id.* at 706. The North Dakota Supreme Court has also held that "[t]he State does not lose its right to exer-

cise authority over a lake merely because its lake bed is subject to private ownership." *North Dakota State Water Comm'n,* 332 N.W.2d at 258 (meandered lake). In Iowa, the public trust doctrine applies broadly to public access of waters, including navigation and recreational activities such as fishing, hiking, camping, biking, and picnicking. *State v. Sorensen,* 436 N.W.2d 358, 363 (Iowa 1989) (land adjacent to Missouri River suitable for use in public access to river part of public trust).

[¶ 40.] Montana's approach to the public trust doctrine reflects a common direction in some western states.[16] In *Curran,* the court held that "under the public trust doctrine and the 1972 Montana Constitution, any surface waters that are capable of recreational use may be so used by the public without regard to streambed ownership or navigability for nonrecreational purposes."[17] 682 P.2d at 171. However, unlike South Dakota, Idaho, Montana, New Mexico, and Wyoming have explicit state constitutional provisions to rely on in order to reach their conclusions.[18]

[¶ 41.] On the other hand, other western states have rejected this trend despite statutory and constitutional provisions declaring all water to be public. In *People v. Emmert,* 198 Colo. 137, 597 P.2d 1025 (1979), Colorado's constitutional provision, nearly identical to the Montana provision, was interpreted as having the opposite

16. "Montana has developed most fully the concept of public ownership of water as the basis for holding bodies of water subject to a public right regardless of bed ownership." OWEN L. ANDERSON ET AL., 4 WATERS AND WATER RIGHTS § 30.04, p69 (Robert E. Beck, ed., 1996).

17. Article IX, Section 3(3) of the Montana Constitution provides that "[a]ll surface, underground, flood, and atmospheric waters within the boundaries of the state are the property of the state for the use of its people

and are subject to appropriation for beneficial uses as provided by law." *Curran,* 682 P.2d at 170.

18. Wyoming has an explicit constitutional provision on ownership of water. Article 8, § 1, of the Wyoming Constitution declares that the waters of "all natural streams, springs, lakes, or other collections of still water, within the boundaries of the State, are the property of the State."

effect. *Id.* at 1026. The *Emmert* Court held that the constitutional provision was primarily intended to preserve the historical appropriation system of water rights on which the irrigation community in Colorado was founded. *Id.* at 1028. The Colorado Supreme Court declined to extend a recreational right to the public in waters on private lands, citing the common law rule that one who owns the surface of the ground has exclusive right to everything above it. *Id.* at 1030.

[¶ 42.] Kansas followed Colorado's lead in *Emmert. Kansas ex rel. Meek v. Hays*, 246 Kan. 99, 785 P.2d 1356 (1990). Despite a statute stating that "[a]ll water within the state of Kansas is hereby dedicated to the use of the people of the state," a statute similar to ours, the *Meek* Court examined several failed bills in the Kansas Legislature to conclude that "[o]wners of the bed of a nonnavigable stream have the exclusive right of control of everything above the stream bed...." *Id.* at 1364–65. The Kansas Supreme Court adopted the Colorado view that statutes granting public ownership to state waters only apply to consumptive uses of water and that "[s]tatutory provisions concerned with consumptive appropriation cannot be applied to subvert a riparian landowner's right to exclusive surface use of waters bounded by his land." *Id.* at 1364.

[¶ 43.] In contrast, as mentioned above, in 1955, our Legislature reconfirmed that all water is public property and abolished the previous rule that standing water belonged to landowners. The following South Dakota statutes, in the Water Resources Act (SDCL ch 46–1), depart from common law notions of private water ownership, and, although they regulate the appropriative and consumptive uses of water, they reflect an aspect of the public trust doctrine, requiring the State to preserve water for public use.

SDCL 46–1–1:
It is hereby declared that the people of the state have a paramount interest in the use of all the water of the state and that the state shall determine what water of the state, surface and underground, can be converted to public use or controlled for public protection.
SDCL 46–1–2:
It is hereby declared that the protection of the public interest in the development of the water resources of the state is of vital concern to the people of the state and that the state shall determine in what way the water of the state, both surface and underground, should be developed for the greatest public benefit.
SDCL 46–1–3:
It is hereby declared that all water within the state is the property of the people of the state, but the right to the use of water may be acquired by appropriation as provided by law.

[¶ 44.] The landowners acknowledge the limitations imposed on them by the Water Resources Act, but argue that the Act does not deprive them of their ownership of the water. Although we agree that this Act certainly displaces common law rules of water use where effective, it does not override the public trust doctrine or render it superfluous. History and precedent have established the public trust doctrine as an inherent attribute of sovereign authority. *See Illinois Cent. R.R. Co.*, 146 U.S. at 455, 13 S.Ct. at 119, 36 L.Ed. at 1043 ("[S]uch property is held by the State, by virtue of its sovereignty, in trust for the public."). The doctrine exists independent of any statute. *See, e.g., Nat'l Audubon Soc'y v. Superior Ct. Of Alpine County*, 33 Cal.3d 419, 189 Cal.Rptr. 346, 658 P.2d 709, 728 n. 27 (1983) ("Aside from the possibility that statutory protections can be repealed, the noncodified public trust doctrine remains

important both to confirm the state's sovereign supervision and to require consideration of public trust uses in cases filed directly in the courts . . . ."), *cert. denied,* 464 U.S. 977, 104 S.Ct. 413, 78 L.Ed.2d 351 (1983); *Kootenai Envtl. Alliance v. Panhandle Yacht Club, Inc.,* 105 Idaho 622, 671 P.2d 1085, 1095 (1983) ("[M]ere compliance by [agencies] with their legislative authority is not sufficient to determine if their actions comport with the requirements of the public trust doctrine. The public trust doctrine at all times forms the outer boundaries of permissible government action with respect to public trust resources.").

[¶ 45.] Thus, while we regard the public trust doctrine and Water Resources Act as having shared principles, the Act does not supplant the scope of the public trust doctrine. The Water Resources Act evinces a legislative intent both to allocate and regulate water resources. In part, this Act codifies public trust principles.[19] The first three sections of the Act embody the core principles of the public trust doctrine—"the people of the state have a paramount interest in the use of all the water of the state," SDCL 46–1–1; "the state shall determine in what way the water of the state, both surface and underground, should be developed for the greatest public benefit," SDCL 46–1–2; and "all water within the state is the property of the people of the state." SDCL 46–1–3. *See Caminiti v. Boyle,* 107 Wash.2d 662, 732 P.2d 989, 995 (1987) (stating Shoreline Management Act complied with the requirements of the constitutional public trust), *cert. denied,* 484 U.S. 1008, 108 S.Ct. 703, 98 L.Ed.2d 654 (1988).

[¶ 46.] From our examination of the statutes and precedent, we conclude that the State of South Dakota retains the right to use, control, and develop the water in these lakes as a separate asset in trust for the public. Accordingly, we align ourselves with the Idaho, Iowa, Minnesota, New Mexico, Montana, North Dakota, Oregon, Utah, and Wyoming decisions that have recognized the public trust doctrine's applicability to water, independent of bed ownership. As our Court stated in 1964, "South Dakota is largely a semi-arid state. The Legislature was fully justified in finding that the public welfare requires the maximum protection and utilization of its water supply." *Knight,* 80 S.D. at 523, 127 N.W.2d at 711. Moreover, we find the public trust doctrine manifested in the South Dakota's Environmental Protection Act, authorizing legal action to protect "the air, water and other natural resources and the public trust therein from pollution, impairment or destruction." SDCL 34A–10–1; *see also* Bradley P. Gordon, *The Emergence of the Public Trust Doctrine as a Public Right to Environmental Preservation in South Dakota,* 29 SD L REV 496 (1984). This Court has previously recognized the public trust doctrine and applied it to navigable waters and their beds. *Flisrand,* 152 N.W. at 800 ("[S]tate holds the title to such lake bed in trust for the benefit of the public."); *Hillebrand,* 274 N.W. at 822–23 ("[S]tate holds title to the bed . . . not in a proprietary capacity, but in trust for the people that they may enjoy the use of navigable waters for fishing, boating, and other public purposes freed of interference of private parties[.]"); *South Dakota Wildlife Fed'n v. Water Mgmt. Bd.,* 382 N.W.2d 26 (S.D.1986). Today we acknowledge, in accord with the State's

---

**19.** SDCL 43–16–1 does not conflict with these laws. That statute provides, "The owner of land in fee has the right to the surface and to everything permanently situated beneath or above it." However, water is not permanent and thus a landowner does not have an exclusive right to it. *See generally Knight,* 80 S.D. 517, 127 N.W.2d 708.

sovereign powers and the legislative mandate, that all waters within South Dakota, not just those waters considered navigable under the federal test, are held in trust by the State for the public.

### D. Extent of Public's Right to Use Water.

[¶ 47.] Having determined that the waters in question are public waters held in trust for the people, the more narrow inquiry is whether the public has a right to use these waters for recreation. As previously mentioned, some states have recognized that the public trust extends to recreational use of public waters independent of bed or adjacent land ownership. *Picabo Livestock, Inc.*, 96 Idaho 360, 528 P.2d 1295 (navigable creek); *Sorensen*, 436 N.W.2d 358 (land adjacent to Missouri River); *Hildreth*, 211 Mont. 29, 684 P.2d 1088 (navigable stream flowing over possibly private land); *Curran*, 210 Mont. 38, 682 P.2d 163 (navigable stream flowing over private land); *Armstrong*, 362 P.2d 137 (regardless of whether it was navigable or nonnavigable river channel open for recreational use); *Orion Corp. v. State*, 109 Wash.2d 621, 747 P.2d 1062 (1987) *cert. denied* 486 U.S. 1022, 108 S.Ct. 1996, 100 L.Ed.2d 227 (owner purchased tidelands subject to requirements of public trust doctrine).

[¶ 48.] In interpreting statutes similar to our Water Resources Act, the Utah Supreme Court held in *J.J.N.P. Co. v. State*, 655 P.2d 1133, 1136, 1137 (Utah 1982):

> Although "navigability" is a standard used to determine title to waterbeds ... it does not establish the extent of the State's interest in the waters of the State.... Section 73–1–1 states: "All waters in this state, whether above or under the ground are *hereby declared to be the property of the public*, subject to all existing rights to the use thereof."

\* \* \*

> Private ownership of the land underlying natural lakes and streams does not defeat the State's power to regulate the use of the water or defeat whatever right the public has to be on the water. *Irrespective of the ownership of the bed and navigability of the water, the public, if it can obtain lawful access to a body of water, has the right to float leisure craft, hunt, fish, and participate in any lawful activity when utilizing that water.*

(Internal citations omitted.) (Emphasis added.) Yet, it must be noted, the lake in *J.J.N.P. Co.* and the waters considered in the cases cited in the previous paragraph do not compare with the lakes at issue here. In *J.J.N.P. Co.*, the lake was "natural" and permanent. In the cases cited in the previous paragraph, the waters were permanent in nature, being flowing streams, rivers, or tidewaters. Here, the trial court found that during the past 125 years the land on which the lakes now exist had been completely dry, marshy, or covered by shallow, seasonal waters. This land in the past seventy years had been used to pasture cattle and raise crops. It has only been in the last five or six years that the land has been continuously covered by water far deeper than previously experienced.

[¶ 49.] Furthermore, although state law in both South and North Dakota makes all water public property, neither state has gone so far as to hold that non-meandered lakes navigable under the state test are open for public recreational uses. *Flisrand*, 35 S.D. 457, 152 N.W. 796 (meandered lake); *Hillebrand*, 65 S.D. 414, 274 N.W. 821 (meandered lake); *Roberts v. Taylor*, 47 N.D. 146, 181 N.W. 622 (N.D.

1921) (meandered lake). It is true, as the State contends, that our standard for determining public use is "whether the water is *capable* of use by the public for public purposes." *Flisrand,* 152 N.W. at 800 (meandered lake) (emphasis added). SDCL 43–17–2.[20] "Public purposes" are defined in SDCL 43–17–21 as "including, but not limited to boating, fishing, swimming, hunting, skating, picnicking and similar recreational pursuits."[21] This test is derived from the "pleasure boat" test for navigability in *Flisrand, Hillebrand,* and *Lamprey.*[22] Nonetheless, this test has only been applied to areas where the State owns both the lake and the bed. We face a more unique question here.

■ [¶ 50.] In abolishing private ownership of "standing water," the Legislature did not necessarily intend that such waters would become open for recreation. On the contrary, in the very Act that abolished this provision, our Legislature appears to have provided reasonable limits respecting vested rights. Thus in eliminating ownership of standing water by private parties, the intent was to preserve water for specific "beneficial" uses. The Water Resources Act states that "Beneficial use is the basis, the measure and the limit of the right to the use of waters described in this title." SDCL 46–1–8. And "beneficial use" is defined as "any use of water within or outside the state, that is reasonable and useful and beneficial to the appropriator, and at the same time is consistent with the interests of the public of this state in the best utilization of water supplies[.]" SDCL 46–1–6(3). Indeed, the highest use for public water in South Dakota has been declared to be "domestic use." SDCL 46–1–5.

[¶ 51.] The Water Resources Act does not explicitly grant to the Water Management Board the responsibility to determine recreational use of public waters. Nonetheless, because the Water Resources Act (SDCL 46) and the Water Resources Management Act (SDCL 46A) are the provisions governing public water lying on or under private property, the Department of Environment and Natural Resources is the agency at present given oversight of these lakes. It is the clear intent of our Legisla-

---

**20.** SDCL 43–17–2 provides:

Unless the grant under which the land is held indicates a different intent, the owner of the upland, if it borders upon a navigable lake or stream, takes to the edge of the lake or stream at low water mark. All navigable rivers and lakes are public highways within fifty feet landward from the water's nearest edge, provided that the outer boundary of such public highway may not expand beyond the ordinary high water mark and may not contract within the ordinary low water mark, and subject to §§ 43–17–29, 43–17–31, 43–17–32, and 43–17–33.

**21.** SDCL 43–17–21 provides:

The Water Management Board shall establish, pursuant to § 43–17–28 and in accordance with the contested case provisions of chapter 1–26, the ordinary high water mark and install benchmarks and may establish the ordinary low water mark *on public*

*lakes which are used for public purposes including, but not limited to boating, fishing, swimming, hunting, skating, picnicking . . . and similar recreational pursuits.* The board may rescind and redetermine the ordinary high water mark and ordinary low water mark, in accordance with the contested case provisions of chapter 1–26, should significant natural changes occur in these levels as determined by the board. (Emphasis added.)

**22.** The test has been refined in Minnesota, where the Minnesota Supreme Court noted that the public right does not attach to "every pothole or swamp frequented by wild fowl and over which a small boat might be poled to retrieve game, but which as a practical matter does not lend itself in any substantial degree to the customary propulsion of boats by outboard motors or oars." *Johnson v. Seifert,* 257 Minn. 159, 100 N.W.2d 689, 697 (1960).

ture to provide for the "general health, welfare and safety of the people" through "the conservation, development, management, and optimum use of all this state's water resources." [23] To balance these multiple uses, the Legislature and Governor formulate policies in the public interest to "be carried out through a coordination of all state agencies and resources." *Id;* SDCL 46A–1–10. Therefore, it is not for us now to proclaim the highest and best use of these public waters in the interest of the "general health, welfare and safety of the people." *Id.* Decisions on beneficial use belong ultimately to the Legislature. SDCL 46–2–11. Deciding how these waters and immediate shorelines should be managed and what constitutes a proper use goes beyond the scope of this opinion. The trial court erred in declaring these waters to be private and in granting an injunction on that basis. In the meantime, in the interest of maintaining the status quo, we leave the injunction intact until such time as, on remand, the trial court has the opportunity to consider the positions of the parties, the state agencies, and the public and grant such relief as it deems appropriate, in light of this opinion.

[¶ 52.] We recognize that it is likely that these lakes will diminish over time. At the time of the trial in this case, the waters had increased. As the circuit court noted, however, the evidence indicates that this increase is temporary, the result of cyclic meteorological changes. In the future, the waters will probably recede and the surface area subject to the public trust will be reduced in proportion, and during that period the landowners will be able to use more of their property. The Legislature may conclude that the public expenditure of money for services and infrastructure to support recreational uses may not be wisely spent, in view of the inevitable reality that these waters will diminish, and perhaps disappear, in the near future. Other, more useful public purposes may be assigned to these lakes, such as wildlife habitat. It remains finally for the Legislature to decide these questions.

[¶ 53.] In conclusion, the public trust doctrine imposes an obligation on the State to preserve water for public use. It provides that the people of the State own the waters themselves, and that the State, not as a proprietor, but as a trustee, controls the water for the benefit of the public. In keeping with its responsibility, the Legislature has designated the Department of Environment and Natural Resources to manage our public water resources. However, it is ultimately up to the Legislature to decide how these waters are to be beneficially used in the public interest.

[¶ 54.] Reversed and remanded.

[¶ 55.] GILBERTSON, Chief Justice, and SABERS, ZINTER and MEIERHENRY, Justices, concur.

---

**23.** SDCL 46A–1–1 provides:

The general health, welfare and safety of the people of the state of South Dakota are dependent upon the conservation, development, management, and optimum use of all this state's water resources. To achieve this objective it is essential that a coordinat-ed, integrated, multiple use water resource policy be formulated and a plan developed to activate this policy as rapidly as possible. It is in the public interest that these functions be carried out through a coordination of all state agencies and resources.